HINTON *et al. v.* SIMS *et al.*

(Division B. Dec. 3, 1934.)

[158 So. 141. No. 31465.]

742

(Division B.   Jan. 14, 1935.)

[158  So.  778.   No.  31465.]

For former opinion, see 158 So. 141.

**Jeff Collins,** of Laurel, for appellants.

E. C. Fishel, of Hattiesburg, and **U. B. Parker,** of Wiggins, for appellees.

744

**Anderson, J.,** delivered the opinion of the court.

Appellants, the widow and children of Johnston Hinton, deceased, brought this action in the circuit court of Perry county against appellees, R. L. Dennis, the sheriff of that county, and the surety on his official bond, National Surety Company, and J. E. Sims, one of his deputies, to recover damages for the death of the husband and father, alleged to have been wrongfully caused by appellee J. E. Sims while acting as such deputy sheriff. The trial resulted in a verdict and judgment for appellees, from which judgment appellants prosecute this appeal.

About eleven o'clock on Sunday morning, May 1, 1932, appellee Sims shot Hinton to death with a double-barreled shotgun loaded with buckshot. Carl Myers, an-

other deputy sheriff, was the only other person present at the shooting. The sheriff, Dennis, and these two deputies had information that there was a still for the manufacture of whisky being operated in Leaf River swamp; they found this still and had been watching it on two or three occasions before the killing of Hinton. They had been watching it for the purpose of apprehending the person or persons who were operating it. Until Hinton was shot near the still they had found nobody there. The still was in an isolated location in Leaf River swamp. About seven o'clock on the night before the killing Sims and Myers, the two deputies, went to the still for the purpose stated; they remained there until something like ten or eleven o'clock that night and saw no one about the still. There were two barrels of mash nearby already fermented and "ready to run." The deputies left and went to their homes, and returned the next morning about 4:30 o'clock and hid themselves behind some bushes and brush; each had a double-barreled shotgun loaded with buckshot. They discovered that, between the time they left there the night before and their arrival that morning the still had been operated, it was hot, and one barrel of mash had been "run." Their place of hiding was about eleven steps from the still. They remained in hiding until about eleven o'clock in the morning. In the meantime Myers had gone to sleep, and Sims was on the watch. He saw Hinton approaching along a path, and awakened Myers. When Hinton got up to a point about eleven steps from Sims and Myers, and about the same distance from the still, Sims testified that he saw that Hinton had discovered and recognized him.

Here is what happened, according to the testimony of Sims, which was corroborated by Myers: Sims told Hinton two or three times to put up his hands; instead of obeying the command, Hinton dropped a little sack he had in his hands to the ground and put his right hand

to his right hip pocket. Sims then repeated, ''Don't do that, put up your hands,'' and then shot.

Neither Sims nor Myers informed, or attempted to inform, Hinton that there was any criminal charge against him for which they were seeking to arrest him. Hinton was never conscious after he was shot; therefore he made no dying declaration. In the little sack he had and threw to the ground there was an empty fruit jar. In his right-hand hip pocket there was a quart bottle in which, according to some of the testimony, there was the smell of whisky, and according to other testimony there was about a spoonful of whisky. He had no weapon of any kind in his right hip pocket or anywhere else about his person. In addition to the quart bottle and fruit jar, he had some fishing tackle in his pockets.

When the shooting took place, the still, and Hinton, and Sims and Myers formed the angles of a triangle—the still being one angle, Hinton another, and Sims and Myers the other, the sides of the angle being about eleven steps or eleven yards. As above stated, the killing took place about eleven o'clock on Sunday morning.

So far as the evidence showed, Hinton neither owned the still nor the land on which it was located. By the usual traveled route he lived about seven miles from the still, but by air line his home was a good deal closer than that. Under the law the possession and operation of the still constituted a felony. Sims and Myers were engaged in an effort to apprehend the felon. They had no warrant for the arrest of any one. The question is whether or not this was an unnecessary and wrongful killing. If it was, the court should have granted appellants' request for a directed verdict as to liability.

Section 1227, Code of 1930, provides: ''An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his

presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested. And in all cases of arrests without warrant, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested on pursuit.''

Under the statute the officers had no right to arrest Hinton without a warrant unless they had reasonable ground to suspect and believe that the still was his, or that he was operating it, and furthermore, in making the arrest they were required to inform him of the object and cause of the arrest. We pass the question of probable ground for the attempted arrest—we do not decide that question—it is unnecessary because we have reached the conclusion that, even though reasonable ground existed, Sims' attempt to arrest Hinton was illegal.

Although the evidence showed that Hinton knew Sims and Myers, and knew that they were deputy sheriffs, it was the duty of Sims to inform him to consider himself under arrest, or by some other language convey to Hinton the idea that he was attempting to arrest him. Instead of doing that, he used the language of a highwayman, ''Put up your hands.'' And, by the way, during these times it is well known that some officers of the law have turned bandits. If it had been shown that Hinton was a desperate and dangerous criminal, a well-known killer, or a would-be killer, Sims might have been justified in proceeding as he did. Gurley v. Tucker (Miss.), 155 So. 189. Must every man, innocent or guilty, put up his hands whenever commanded to do so by an officer, whether in the daytime or nighttime, and regardless of the situation and surroundings, without being informed by the officer of the reason for the command? We think

not. We do not mean to convey the idea that the officer must always inform the person sought to be arrested of the object and cause of the arrest before it is made, but we do hold that, except in rare cases, such as referred to in the Gurley case, he should inform him that he consider himself under arrest. After the arrest is made it is time enough to inform the accused of the object and cause of the arrest. If Sims had pursued that course, the probability is that the killing never would have occurred. In other words, if Sims had used the language of an officer rather than that of a highwayman, the tragedy might have been avoided.

For these reasons the attempted arrest was illegal. Sims did not comply with the law. He had no right to arrest Hinton in the manner attempted. Hinton had a right to resist, and in doing so use the necessary force to meet force. We hold that the killing of Hinton by Sims was a negligent, unnecessary, and wrongful killing. The evidence shows this without conflict. Therefore the appellants' request for a directed verdict on liability should have been given.

Reversed and remanded.

## On Suggestion of Error.

**Griffith, J.**, delivered the opinion of the court on suggestion of error.

In the trial court a verdict and judgment was rendered for the defendants therein, appellees here. In considering the record of the appeal, we came to the conclusion that the judgment was erroneous, and that, upon the record as it was made before the trial court, the plaintiffs there, appellants here, should have had a directed verdict on the issue of liability. We therefore ordered the judgment reversed and that the cause be remanded for a new trial. Appellants now suggest that we should

have entered judgment here in behalf of appellants on the issue of liability, and remanded only on the issue of the amount of the damages.

Ordinarily, when prejudicial error is found in a trial record, we reverse and remand the cause as to all its issues. Occasionally, however, we affirm as to liability and reverse only as to damages. This, in appropriate cases, is authorized both by rule of court and by statute. But we recall no case in tort, nor has counsel brought any such case to our attention, in which we have reversed as to liability and thereupon entered judgment here for the plaintiff on that issue. And while we are not holding that we have no such power as suggested, we do not think the case before us is so extremely exceptional as that we should exercise it in this instance, if such power exists.

Suggestion of error overruled.