443 So.2d 806 (1983)
Bobby CALDWELL
v.
STATE of Mississippi.
No. 54285.
Supreme Court of Mississippi.
November 16, 1983.
Rehearing Denied February 1, 1984.
*808 Cleve McDowell, Ellis Turnage, Morris & Turnage, Cleveland, for appellant.
Bill Allain, Atty. Gen. by Amy D. Whitten, Sp. Asst. Atty. Gen., Jackson, Bobby Williams, Asst. Dist. Atty., Hernando, for appellee.
En Banc.
DAN M. LEE, Justice, for the Court:

PART I

THE GUILT PHASE
This is an appeal from the Circuit Court of DeSoto County wherein the appellant, Bobby Caldwell, was found guilty of the capital murder of Elizabeth Faulkner and sentenced to die in the gas chamber.[1] Upon motion of the appellant, the venue of the trial was changed from Panola County to DeSoto County. The trial court set the date of execution as January 15, 1982. Caldwell brought this appeal and assigns as error the trial court's actions in:
1. denying defendant's motion to declare the warrantless arrest illegal in that evidence of another crime was admitted; no probable cause existed at the time of arrest; appellant was not informed of his arrest; the trial court's ruling on the motion was against the weight of the evidence;
2. denying defendant's motion to suppress the alleged statement, in that the ruling is against the weight of the evidence;
3. denying the defendant's motion for a special investigator and ballistic expert at state expense, which violated defendant's due process of law;

*809 4. the state failed in proving venue in that Panola County, Mississippi, has two judicial districts.
Mr. Robert Faulkner and Mrs. Elizabeth Faulkner were husband and wife. Together they owned Mrs. Lee's Bait Shop, a small grocery store and bait shop on Highway 315 near Sardis Reservoir in Panola County. On the morning of October 29, 1980, Mrs. Faulkner was in the store and her husband was in the back part of the building which served as the couple's living quarters. Mr. Faulkner testified that he heard his wife scream and then two shots fired. He took a shotgun and went to the door which separated the living quarters from the store. From there he saw a black man dressed in dark clothing and a dark toboggan-style hat running out of the store. Mr. Faulkner went through the store and saw his wife lying on the floor behind the counter. He then ran out of the store and fired his shotgun twice at the fleeing assailant. The second time he fired the assailant was jumping over a barbed wire fence and running into a wooded area. Mr. Faulkner then returned to his wife and called an ambulance for her.
The Faulkner's daughter-in-law lived next door to the store. She came over immediately and called the Panola County Sheriff's Office. Deputy J.C. Sexton arrived approximately twenty minutes later. He was told what direction the assailant ran, whereupon he immediately followed on foot. When Deputy Sexton reached the barbed wire fence he found a right handed brown cotton glove stuck on a barb. Crossing the fence, Sexton found fresh boot prints in the mud and followed them approximately .25 miles to a logging road right off of the highway. Sexton testified that the boot tracks ended by some fresh tire tracks. The car was gone but mud on the road indicated the direction it traveled.
The Panola County Sheriff, David Bryan, ordered that roadblocks be set up throughout the area. Officers at the roadblocks were given a description of the suspect and told he was driving a red and white Malibu or a Chevelle. Shortly thereafter Sheriff Bryan received word that a man matching the suspect's description had passed through at least two roadblocks in a red and white car. At the roadblocks the suspect was identified as the appellant, Bobby Caldwell. The sheriff then instructed Deputies Sexton and Rudd to bring Caldwell in for questioning.
Sexton and Rudd immediately went to Caldwell's parents' home where they found Caldwell washing a red and white Chevrolet. Caldwell was dressed in dark coveralls, toboggan hat and rubber boots. Deputy Sexton testified that Caldwell's boot tracks in the mud around the car matched those he had followed in the woods a few hours earlier. The officers told Caldwell that they wanted him to accompany them to the Batesville jail because the Sheriff wanted to talk to him. Caldwell started toward the open door on the driver's side of his car when Deputy Sexton noticed the handle of a pistol partially exposed under the car seat. Sexton ordered Caldwell to "Woap, hold it right there" and Deputy Rudd handcuffed him. Sexton retrieved the pistol and determined that it had four (4) live rounds and two (2) spent cartridges in it.
Caldwell was taken to the Batesville jail between 10:00 a.m. and 11:00 a.m. the morning of the shooting. A search of his clothing revealed a left handed brown cotton glove similar to the one found on the fence. Caldwell was given his rights and he denied any involvement in the shooting. He was then placed in a lineup and identified by Mr. Faulkner as the assailant.
The following morning Caldwell asked to speak to Deputy Rudd. Rudd and Sheriff Bryan then interviewed Caldwell and from that interview emerged a three page statement in which Caldwell admitted shooting Mrs. Faulkner while attempting to rob her store. The statement is in the sheriff's handwriting and is not signed by Caldwell. Caldwell denied ever having made the statement. Following the statement Caldwell was formally arrested and charged with Mrs. Faulkner's murder.
*810 The proof at trial included Mr. Faulkner's in-court identification of Caldwell as the assailant, Caldwell's statement, and several expert witnesses who testified that the boot tracks, tire tracks, and ballistic comparisons all corresponded with Caldwell's boots, tires and weapon confiscated from his car. The jury found Caldwell guilty. The same jury also imposed the death penalty.
Caldwell's first assignment of error groups together four different arguments: (1) the admission of evidence of other crimes during the hearing on the legality of his warrantless arrest, (2) the lack of probable cause to make an arrest, (3) the failure to inform him of his arrest, and (4) the court's error in weighing the evidence. Although lumped together under one assignment of error, we will discuss each of these arguments separately so as to avoid confusion.
At the time Sheriff Bryan directed Deputies Sexton and Rudd to bring Caldwell in for questioning, the sheriff suspected that he was involved in an attempted robbery of a package store. The package store robbery occurred on October 20, 1980, just nine days prior to Mrs. Faulkner's murder. Sheriff Bryan had information from witnesses to the attempted package store robbery, that the suspect was a black male in his early to mid twenties and drove a two tone red car which had been shot in the trunk during the attempted robbery. The sheriff later received information that a car matching the description of that used in the attempted robbery had been at a local convenience store and had a recently patched and painted hole in the trunk. The information also included the car's license tag number, PAN 777. A check on that tag revealed the car was registered to Caldwell's father, Dempsey Caldwell, Sr. Using this information, Sheriff Bryan discovered that Caldwell was on work release from Parchman and had not been at work the day of the attempted robbery of the package store. Sheriff Bryan had ordered Deputy Rudd to locate Caldwell but these efforts had been futile. When Deputies Sexton and Rudd arrived at the home of Caldwell's father, after Mrs. Faulkner's shooting, the red and white car Caldwell was washing had a patch on the trunk and had been freshly painted.
In the hearing on Caldwell's motion to declare the warrantless arrest illegal and to suppress evidence obtained therefrom, the judge allowed all of the foregoing testimony regarding the attempted package store robbery. Caldwell argues that evidence of other crimes was inadmissible during this hearing. His position is that the evidence was irrelevant to the purpose of the hearing  determining whether probable cause for his arrest existed. It is a settled rule in Mississippi that proof of a crime distinct from that alleged in the indictment is generally inadmissible at the accused's trial on the merits. Eubanks v. State, 419 So.2d 1330 (Miss. 1982). The rationale for this rule is that evidence of other crimes may tend to prejudice the minds of the jurors or confuse them as to the real issues on trial.
In the instant case, there was no possibility that the evidence would prejudice the jury because the evidence was taken during a suppression hearing before a jury had even been impaneled. In Brooks v. State, 242 So.2d 865 (Miss. 1971), this Court held that the "acid test" is the relevancy of the evidence to the purpose or purposes for which it is sought to be introduced. The relevancy here must relate to probable cause for the arrest. Certainly the fact that the law enforcement officers considered Caldwell a suspect in another recent similar crime involving an attempted robbery was relevant to their suspicion and he was involved here, particularly so when descriptions of the suspect and get-away cars were identical. Because there was no jury at this hearing the policy considerations designed to prevent prejudice do not apply to this evidence and its admission was not error.
Did probable cause exist at the time of Caldwell's arrest? In Michigan v. DeFillippo, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), the United States Supreme *811 Court stated that "probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." 443 U.S. at 37, 99 S.Ct. at 2632, 61 L.Ed.2d at 350. In Powe v. State, 235 So.2d 920 (Miss. 1970), this Court set forth a two-pronged test to determine probable cause. The arresting officer must first have reasonable cause to believe a felony is being committed and secondly, must have reasonable cause to believe that the person proposed to be arrested is the one that committed it. Reasonable cause to believe a suspect has committed a crime does not require evidence sufficient to support a conviction. Powe, supra. Caldwell concedes the first part of this test but he argues that there was not reasonable cause to believe that he had committed the crime.
The evidence at the hearing shows that Officers Sexton and Rudd had ample cause to reasonably believe Caldwell committed the crime. Caldwell matched the description the officers had for the suspect as related to both physical description and wearing apparel and he was washing a car that matched the description of the vehicle involved. Also, Officer Sexton recognized Caldwell's boot print as identical to those he followed through the woods behind the bait shop. At the time of the arrest the officers also had information that Caldwell had passed through at least two roadblocks in the area of the crime. We hold that that information was sufficient to give the officers reasonable cause to believe Caldwell was involved in the crime.
Was Caldwell adequately informed of his arrest? Sheriff Bryan testified that Caldwell was not officially arrested until after he gave the statement on October 30, almost 24 hours after being taken into custody, although he was informed of his rights prior to that. In the case of Hinton v. Sims, 171 Miss. 741, 158 So. 141 (1934), this Court ruled that an arrest was illegal where the arresting officer failed to notify the suspect he was under arrest. In Hinton, we said:
Although the evidence showed that Hinton knew Sims and Myers, and knew that they were deputy sheriffs, it was the duty of Sims to inform him to consider himself under arrest, or by some other language convey to Hinton the idea that he was attempting to arrest him. Instead of doing that, he used the language of a highwayman, "Put up your hands." And, by the way, during these times it is well known that some officers of the law have turned bandits. If it had been shown that Hinton was a desperate and dangerous criminal, a well-known killer, or a would-be killer, Sims might have been justified in proceeding as he did. Gurley v. Tucker [170 Miss. 565], 155 So. 189. Must every man, innocent or guilty, put up his hands whenever commanded to do so by an officer, whether in the daytime or nighttime, and regardless of the situation and surroundings, without being informed by the officer of the reason for the command? We think not. We do not mean to convey the idea that the officer must always inform the person sought to be arrested of the object and cause of the arrest before it is made, but we do hold that, except in rare cases, such as referred to in the Gurley Case, he should inform him that he consider himself under arrest.
171 Miss. at 747, 158 So. at 143. Caldwell meets the requirement of the Gurley exception as a desperate and dangerous criminal. Also, the fact that he was under arrest was certainly obvious to Caldwell as he was not free to leave the Batesville jail, was informed of his rights and of the fact that the sheriff wanted to question him regarding a murder. These facts read together indicate that Caldwell was well aware of his arrest prior to being notified thereof. As Caldwell was given his rights and knew that he could request an attorney, the failure to expressly inform him of his arrest on October 29 was not a reversible error. Based on all the foregoing, it *812 cannot be said that the trial judge's ruling at the suppression hearing was against the overwhelming weight of the evidence.
Caldwell's second assignment of error is the trial court's failure to suppress the alleged statement. Here it must be noted that Caldwell does not contend that the statement was illegally obtained, rather he argues that it was never made. This Court has held that when there is a conflict as to whether an accused actually gave a statement the resolution of such conflict is for the jury. Talbert v. State, 347 So.2d 352 (Miss. 1977). In Talbert this Court held:
The true rule, as applied by the trial court in this case, is found in Weathers v. State, 237 So.2d 441 (Miss. 1970). In that case, the police officer testified that a confession had been made, and the defendant claimed that it had not. We held, "The conflict between Weathers and the officer as to whether Weathers had, in fact, made the statement attributed to him created a factual issue, the resolution of which lay peculiarly within the province of the jury." Id. at 442. Thus, the court properly admitted the testimony of Deputy Sheriff Nail regarding Talbert's confession. The jury was free to decide whether the statement had been made, and to decide what weight to give it.
347 So.2d at 355. Therefore, based on Talbert, the statement was properly admitted and it became a question for the jury as to whether Caldwell ever made such statement.
Caldwell's third assignment of error contends that the refusal of the trial court to grant his motion that he be provided with an expert in the field of ballistics and an investigator was a denial of due process. Prior to the trial Caldwell filed a motion for an order that he be provided with psychiatric and ballistic experts at state expense. The trial court granted the motion as to the psychiatric expert but denied the ballistic expert. In Phillips v. State, 197 So.2d 241 (Miss. 1967) this Court ruled on the necessity of providing criminal defendant with a psychiatric expert:
Neither the United States Constitution nor the Mississippi Constitution requires that the nation or state furnish an indigent defendant with the assistance of a psychiatrist. The only assistance that they require is the assistance of legal counsel. (Emphasis ours)
197 So.2d at 244. In the case of Bullock v. State, 391 So.2d 601 (Miss. 1980), this Court went further to say that the failure to outline specific costs and in specific terms the purposes and value of such requested expert rendered the trial court's refusal to authorize such expenditure non reversible. In the instant case Caldwell's motion simply included the general statement that the requested expert "would be of great necessarius witness." It did not estimate the cost of such expert nor the specific value. Therefore, the trial court's failure to provide the requested expert witness or investigator did not constitute reversible error.
Caldwell's final assignment of error as to the guilt phase is that the state failed to prove venue of the crime. This contention is readily disposed of. During the redirect examination of Sheriff Bryan the following exchange between the prosecutor and sheriff occurred:
Q. Sheriff Bryan, what judicial district, county and state is Mrs. Lee's located in, please?
A. First Judicial District, Panola County, State of Mississippi.
Prior testimony had shown the murder to occur at Mrs. Lee's Bait Shop therefore, venue was established.
Finding no reversible error in the guilt phase, it is affirmed.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, PRATHER and ROBERTSON, JJ., concur.
HAWKINS, J., not participating.

*813 PART II
BROOM, Presiding Justice, for the Court:
Defense counsel, in his closing argument, asked on behalf of the defendant "that the rest of his life be spent behind bars". He was suggesting to the jury that should it fix the defendant's punishment at life imprisonment, the effect of such a sentence would be life behind bars without any parole or leniency extended. Having made that statement to the jurors, defense counsel then quoted a poem about "judgment", "mercy", "Our Father in Heaven", "forgiveness", and electrocution. He discussed the Ten Commandments and asked the jurors to judge the defendant "as Jesus would do." Then he again repeated,

I'm asking you to put him in jail for the rest of his life. He's violated one of the Ten Commandments. "Thou shalt not kill." But, doesn't that apply to us, too? Should we make it our decision to kill someone else? One of the most remarkable phrases I've ever heard was said by a man who was nailed to the cross, who was tortured and just before he died, he said these words, "Father, forgive them for they know not what they do."
(Emphasis added).
Relying upon Howell v. State, 411 So.2d 772 (Miss. 1982); Evans v. State, 422 So.2d 737 (Miss. 1982); Gilliard v. State, 428 So.2d 576 (Miss. 1983); and Edwards v. State, 441 So.2d 84 (Miss. 1983), reversal is sought because the prosecutor commented to the jurors that "the decision you render is automatically reviewable by the Supreme Court." Hill v. State, 432 So.2d 427 (Miss. 1983), held that the prosecutor's statement to the jury that their finding would not be the "last word" was procedurally waived for failure of any objection being made to the argument. In the present case, objection was made but the matter was not assigned as error on appeal here.
Pertinent here, though not precisely analogous on the facts, is the rationale and reasoning of the United States Supreme Court in California v. Ramos, ___ U.S. ___, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). Ramos involved a challenge made to a state jury instruction which told the jury that
[U]nder the State Constitution a Governor is empowered to grant a reprieve, pardon, or commutation of a sentence following conviction of a crime.
Under this power a Governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole.
___ U.S. at ___, 103 S.Ct. at 3450, 77 L.Ed.2d at 1177.
On appeal, the California Supreme Court held that the jury instruction required reversal because it violated the eighth and fourteenth amendments for inviting the jury to consider factors foreign to the task of deciding whether the defendant should live or die, and injected an entirely speculative element into the capital sentencing determination. It also held that reversal was warranted because the instruction left the jury with the mistaken belief that the only way to keep the defendant off the streets was to sentence him to death.
We note here that defense counsel's closing argument for Bobby Caldwell in the present case stated that the jury should effectively remove Caldwell from society forever by giving him a sentence of life imprisonment. This is an obvious inaccuracy and misstatement of the law because there is almost always a possibility of parole in every case, except cases involving persons convicted and sentenced as habitual criminals.
Clearly, Ramos leaves the state with the prerogative to determine whether juries should be informed of sentencing alternatives such as parole or commutation of a sentence. By the same reasoning, states may decide whether it is error to mention to jurors the matter of appellate review, which review is mandated by our statute: Mississippi Code Annotated § 99-19-105 (Supp. 1982). On this basis, we think, upon the facts of this case, reversal *814 is not warranted merely because the jurors during the sentencing phase were told that death penalty trials are subject to appellate review by this Court.
Again it is pointed out that it was here in the present case, during defense counsel's argument, that he inaccurately sought to convince the jury that if they meted out a life sentence the defendant would remain in prison the remainder of his life. He left them with the impression that there would be no parole or commutation of sentence. He emphasized his pitch for mercy by referring to the Ten Commandments, Jesus and the Heavenly Father. In this context, and upon the cogent evidence of the defendant's guilt, we do not think the punishment phase should be reversed merely because the prosecutor (subsequent to the defense argument) and then the judge truthfully and accurately stated that the sentence of death would be automatically reviewed by a higher court.
Evidence of the defendant's guilt is overwhelming in the present case and it cannot be said that any injustice would occur by affirmance. Here it appears upon the whole record that the defendant's guilt of an extremely calloused and senseless murder has been established beyond all reasonable doubt. Indeed, the evidence of guilt is not even close but is absolutely overwhelming. Further, the evidence clearly establishes that his past criminal record includes four convictions of felonies involving the use of threat or violence to another person.
Prueitt v. State, 261 So.2d 119 (Miss. 1972), is a case in which we dealt with the situation where counsel sought to argue a question not raised by the assignment of error. Writing for the Court in that case, Justice Jones states "We do not deem these matters [those not assigned] plain error... ." Bell v. State, 360 So.2d 1206 (Miss. 1978), although I dissented because I deemed the record tainted with so many serious errors as to render the trial an improper basis to affirm the death penalty, is analogous to the present case, in that Bell dealt with errors "not urged or argued in the briefs... ."
This case is factually distinguishable from Howell, Evans, Gilliard, Edwards and Hill, supra. While the error complained of here was not invited to the extent that the reviewability of death penalty cases was mentioned first by defense counsel, defense counsel sought to leave the impression that a life imprisonment sentence would absolutely leave the defendant behind bars the rest of his life.[2] Upon the evidence and posture of this record, reversal is not warranted.
As required by Mississippi Code Annotated § 99-19-105, (Supp. 1982), we have carefully reviewed the entire record including the sentencing phase of the trial. We find that no influence of passion, prejudice, or any other arbitrary factor influenced the jury in its imposition of the death penalty. The jury's finding the aggravating circumstances: that the murder was committed while the defendant was engaged in the commission of robbery or attempted robbery, that it was committed for pecuniary gain, that it was especially heinous, atrocious, or cruel, and that the defendant was previously convicted of four felonies involving the use of threat or violence to the person, and that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances" was supported beyond a reasonable doubt by the evidence. We think the evidence clearly justifies the death penalty.
As § 99-19-105 requires, we have reviewed the cause including all motions, pleadings, requests and jury instructions. Appropriate guidance was given the jurors during all phases of the trial. Comparison of this case with other cases in which the death penalty has been imposed and upheld establishes that such penalty is not wanton, freakish, excessive, nor disproportionate to the sentence imposed in such cases. See Appendix "A" attached. Execution of defendant Bobby Caldwell would be consistent and evenhanded with all the post-Jackson *815 death penalty cases previously affirmed by us. Caldwell received a fair trial in all respects. Our examination of the record reveals no reversible error and no such error has been established by the briefs or oral argument. Therefore, we must affirm.
AFFIRMANCE is ordered, and Wednesday, the 21st day of December, 1983, is fixed as the date on which the death sentence shall be executed, as provided by law.
AFFIRMED.
WALKER, P.J., ROY NOBLE LEE and BOWLING, JJ., concur as to Part II.
DAN M. LEE, J., PATTERSON, C.J., PRATHER and ROBERTSON, JJ., dissent.
HAWKINS, J., not participating.

APPENDIX "A"
DEATH CASES AFFIRMED BY THIS COURT:

Irving v. State, 441 So.2d 846 (Miss. 1983).

Tokman v. State, 435 So.2d 664 (Miss. 1983).

Leatherwood v. State, 435 So.2d 645 (Miss. 1983).

Hill v. State, 432 So.2d 427 (Miss. 1983).

Pruett v. State, 431 So.2d 1101 (Miss. 1983).

Gilliard v. State, 428 So.2d 576 (Miss. 1983).

Evans v. State, 422 So.2d 737 (Miss. 1982).

King v. State, 421 So.2d 1009 (Miss. 1982).

Wheat v. State, 420 So.2d 229 (Miss. 1982).

Smith v. State, 419 So.2d 563 (Miss. 1982).

Edwards v. State, 413 So.2d 1007 (Miss. 1982).

Johnson v. State, 416 So.2d 383 (Miss. 1982).

Bullock v. State, 391 So.2d 601 (Miss. 1980).

Reddix v. State, 381 So.2d 999 (Miss. 1980).

Jones v. State, 381 So.2d 983 (Miss. 1980).

Culberson v. State, 379 So.2d 499 (Miss. 1979).

Gray v. State, 375 So.2d 994 (Miss. 1979).

Jordan v. State, 365 So.2d 1198 (Miss. 1978).

Voyles v. State, 362 So.2d 1236 (Miss. 1978).

Irving v. State, 361 So.2d 1360 (Miss. 1978).

Washington v. State, 361 So.2d 61 (Miss. 1978).

Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:

Irving v. State, 441 So.2d 846 (Miss. 1983).

Dycus v. State, 410 So.2d 246 (Miss. 1983).

Edwards v. State, 441 So.2d 84 (Miss. 1983).

Coleman v. State, 378 So.2d 640 (Miss. 1979).
DAN M. LEE, Justice, dissenting as to Part II:
Certainly the most solemn and portentous duty any state may require of its citizens is to serve as a juror in a capital murder trial. Not even the role of executioner can be said to require greater introspection, for the executioner is not required to decide fate, but only to implement the decisions of others. Only the hearts and minds of the jurors may impose that ultimate punishment by unanimously agreeing that an accused has committed such an atrocious act as to warrant the taking of his life. The gravity and uniqueness of the death sentence require that jurors in a capital case view their role with particular importance, and fairness to the accused dictates that nothing occur at trial which lessens or diminishes the jurors' perception of their responsibility. Because I believe that the remarks by the prosecutor and trial judge concerning appellate review had this effect, I respectfully dissent from Part II of the majority's opinion.
*816 The majority relies on California v. Ramos, ___ U.S. ___, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), yet they acknowledge that Ramos leaves the decision of whether to inform the jury of extraneous matters with the individual states. This Court has made it plain that comments such as occurred in this trial constitute reversible error in Mississippi. In Howell v. State, 411 So.2d 772 (Miss. 1982), we held that a prosecutor's argument which informed the jury that the verdict was subject to a right of appeal constituted reversible error. The logic of this rule is beyond question. Comment of this nature has the effect of lessening a juror's sense of responsibility for the fate of the accused. Those jurors who are not convinced that a defendant's life should be taken may not argue so strongly or hold their position when they are led to believe that a reviewing court will correct a mistake in their judgment.
In the instant case the error went far beyond that in Howell. In Howell the prosecutor repeatedly ignored the trial court's ruling that his comments concerning appellate review were improper. Here the prosecutor's comments went so far as to not only lessen the jury's sense of responsibility but to practically remove it altogether. The prosecutor argued:
Now, they would have you believe that you're going to kill this man and they know  they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet they... . (emphasis added)
At this point the defense counsel objected and the prosecuting attorney responded:
Your Honor, throughout their argument, they said this Panel was going to kill this man. I think that's terribly unfair. (emphasis added)
The trial court then compounded the error with a ruling that crowned it with a false halo of propriety:
All right, go on and make the full expression so the jury will not be confused. I think it is proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the jury so they will not be confused. (emphasis added)
The prosecuting attorney then made his "full expression." He argued that defense counsel had insinuated
that your decision is the final decision and that they're going to take Bobby Caldwell out in the front of this courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court.
A reading of the prosecutor's comments coupled with those of the trial judge could certainly give a juror the impression that the jury's decision was nothing more than window dressing. Not only did those comments reduce the jury's sense of responsibility, they were factually inaccurate. A jury should not be told that they are not "going to kill this man" if they decide to impose the death penalty. The purpose of a bifurcated trial is to insure that it is indeed solely the jury that condemns an accused to die and that they have no partners in the exercise of that awesome responsibility. Even a novice attorney knows that appellate courts do not impose a death penalty, they merely review the jury's decision and that review is with a presumption of correctness. When a jury is faced with so solemn a task as deciding whether to impose the death penalty we must not allow their sense of responsibility to weaken. In my view the majority's opinion takes a step backward from Howell, a step which I feel is misguided.
The majority's opinion fails to make it clear just why the remarks in question are not reversible error, although two possible alternatives are discussed; invited error and failure to raise the issue on appeal. Apparently the majority has decided that defense counsel invited error by arguing that the jury should sentence Caldwell to life imprisonment. Here the majority's position fails in two regards. First, because *817 the statute provides only two possible sentencing alternatives, life imprisonment or death, defense counsel has little choice but to plead that his client be sentenced to life imprisonment. Section 99-19-101 Miss. Code Ann. (Supp. 1983). It is a twisted bit of logic indeed that denies a defendant's counsel the right to argue the only statutory alternative to death without calling that argument an invitation to error. Secondly, the concept of invited error fails because it is simply inapplicable to the facts of this case. Assuming without accepting the majority's position that the defense counsel's argument invited error, it certainly did not invite this error. Asking the jury to show mercy does not invite comment on the system of appellate review. This is true whether the plea for mercy discusses Christian, Judean or Buddhist philosophies, quotes Shakespeare or refers to the heartache suffered by the accused's mother. The plea is made directly to the jury as only they may impose the death sentence. Under our standards of appellate review mercy is irrelevant. There is no appellate mercy. Therefore, the fact that review is mandated is irrelevant to the thought processes required to find that an accused should be denied mercy and sentenced to die. Defense counsel's plea for Caldwell's life did not invite the comment in question.
The only other basis in the majority opinion for refusing to find that the comment was reversible error is a brief mention that an objection was made but that it was not assigned as error on this appeal.[1] In Hill v. State, 432 So.2d 427 (Miss. 1983) we reaffirmed Howell and held that comments of this nature are "clearly erroneous and would ordinarily be highly prejudicial." 432 So.2d at 439. In Hill, unlike the present case, there was no contemporaneous objection to the prosecutor's comments. We refused to reverse Hill because of the difficulty of distinguishing between trial tactics and simple failure to object. Here we are not faced with that problem. The failure to assign the matter as error could in no way be called a deliberate trial tactic. Surely we will not send a man to the gas chamber because his attorney failed to address an obvious error. We have repeatedly held that we give a heightened review in capital cases. Laney v. State, 421 So.2d 1216 (Miss. 1982); Irving v. State, 361 So.2d 1360 (Miss. 1978). If the concept of heightened review is to have any meaning it must stand for the rule that we will not allow reversible error to be ignored because of the attorney's failure to raise it. The purpose of heightened review is to insure that a procedural bar does not become a guillotine. I would reverse the sentencing phase of the bifurcated trial and remand for a new trial on sentencing alone.
PATTERSON, C.J., and PRATHER and ROBERTSON, JJ., join in this dissent.
NOTES
[1] PART I, the guilt phase of this opinion, is written by Dan Lee, Justice for the Court, joined by all other Justices except Justice Hawkins, who recused himself from the case.

PART II, the penalty phase of this opinion, is written by Broom, Presiding Justice, joined by Walker, P.J., Roy Noble Lee and Bowling, JJ. Dissent by Dan Lee, Justice, joined by Patterson, C.J., Prather and Robertson, JJ. Hawkins, J. not participating. Being a 4-4 tie the death penalty is therefore affirmed.
[2] To that extent, the response of the prosecutor was invited.
[1] We note that Caldwell's trial counsel is not representing him in this appeal and that his current counsel had no involvement in this matter prior to the appeal.