# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 91-DP-01190-SCT

*HENRY CURTIS JACKSON, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/14/91 |
| TRIAL JUDGE: | HON. GRAY EVANS |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHNNIE E. WALLS, JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | NA |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 12/5/96 |
| MOTION FOR REHEARING FILED: | 8/20/96 |
| MANDATE ISSUED: | 12/12/96 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. Henry Curtis Jackson, Jr. was indicted by a grand jury of the Leflore County Circuit Court in connection with the November 1, 1990 stabbing deaths of his four young nieces and nephews and aggravated assaults upon his sister and another niece while he was in search of money kept in a safe in his mother's home near Greenwood, Mississippi. After a change of venue to Copiah County, a jury found him guilty on all counts and sentenced him to death for each of the four capital murder charges; thirty years in the custody of the Mississippi Department of Corrections for each of the two counts of aggravated assault; and twenty years in the custody of the MDOC on one count of armed robbery.[1] Appealing the capital murder convictions, Jackson raises thirty-eight assignments of error arising from both the guilt and sentencing phases of his trial. Finding, at best, harmless error, we affirm his convictions and sentences.

## I.

¶2. Mrs. Jackson and four of her older grandchildren left her home in the Rising Sun community, south of Greenwood, Mississippi, for church at the Sweet Home Church of God in Christ at around 7:00 p.m. on November 1, 1990. Her daughter, Regina Jackson, stayed at home with her two

daughters, five-year old Dominique and two-year old Shunterica, and four nieces and nephews, eleven-year old Sarah, three-year old Antonio, two-year old Andrew and one-year old Andrea. While they were watching an hour-long Cosby Show special on television, Regina's older brother, Henry Curtis Jackson, known to the family as "Curtis," knocked on the door and came inside. He asked Regina for a cigarette and then ran to the bathroom, asking her to fix him something for an upset stomach. Sarah recalled that Jackson asked if her Uncles Greg or Johnny were coming over and then put a glove over his hand and wiped clean the knob of the living room door.

¶3. Jackson then asked Regina to check the telephone and she discovered it was dead. Together with Antonio, she left for a neighbor's house. Jackson directed Sarah to call her back. He then caught Regina from behind, with one hand around her neck and one around her stomach. He asked her if she had gotten her check and told her that "he wanted twenty dollars for some ass." When she said she didn't have the money, he pulled a knife out and pushed "one in my chin and one in my stomach." Regina yelled for Sarah, who came running and jumped on Jackson's back. The three struggled and then began to talk. Regina testified:

> We said, "Curtis, we love you. Why do you want to do us like this. Don't kill us, Curtis. He just went on and was talking about what he wanted to do. He told me, he said, "Regina, I love you but I have got to kill you."

¶4. When Regina asked Jackson what he wanted, he told her that he had come to get the safe that was kept in Mrs. Jackson's bedroom closet. The safe contained cash, jewelry and a certificate of deposit belonging to Mrs. Jackson and her son, Eddie Self. She testified that only Self's daughter, Tara, and Mrs. Jackson knew the combination to the safe. She further stated:

> He really wanted the combination but my niece, Sarah, kept telling him to get the safe and go ahead. He said, naw, cause he came to kill us that Thursday and didn't kill us and he came to kill us that Saturday and he didn't kill us and he said he was going to kill all of us tonight.

He then took Regina into Tara's room and tried to open the footlocker where he had been told the combination was kept. At that point, Regina testified, he began stabbing Sarah in the neck and took them into the little boys' room where he told them to let him tie them up. Regina, who had already been stabbed several times, picked up some iron rods that Jackson had brought in from the bathroom and started hitting him with them. He then picked up the baby, Andrea, and used her as a shield. Regina relinquished the rods and let him tie her up with a belt. He stabbed her again in the neck. While she watched, he picked up her daughter, two-year old Shunterica, by the hair, stabbed her and laid her on one of the beds. Jackson started dragging the safe down the hall, which awakened five-year old Dominique. She came down the hall, calling for her mother, at which time, Regina testified, Jackson told her that he loved her, stabbed her and threw her on the floor. He walked over to Regina and again "drilled the knife" in her neck. Regina pretended she was dead until she heard him go into the bathroom and out the window.

¶5. Sarah recalls responding to Regina's cries for help, finding her in the boys' bedroom with Jackson sticking one knife at her chin and the other at her waist. Referring to the stab wounds in Regina's neck, Sarah testified that she "had some meat hanging from her chin." Sarah jumped on Jackson's back in an attempt to stop him. Regina then tried to hit Jackson with an iron rod he had brought in from the bathroom. At that point, Sarah testified, Regina told her that Jackson had stabbed

Shunterica. Sarah tried to comfort her baby sister, Andrea, and told Antonio to run for help. Jackson called the child back. Regina, by this time, had fainted and Jackson was trying to wake her up. Once he had done that, he grabbed Sarah again and began stabbing her in the neck. After the knife broke off in her neck, he ran to the kitchen, retrieved another knife, stabbed her again and threw her on a bed. Sarah, too, pretended she was dead. She heard her brother, Antonio, yelling for help and saw Jackson kneeling over him. While Sarah did not actually see Jackson stabbing him, she testified that ". . . I saw his hand moving when he was over him. I didn't see but I knew he was doing something cause my little brother was hollering." She likewise did not witness the stabbing of Andrew, but when she saw him, "[h]e was on the bottom of the bed and his eyes were bulging and his mouth was wide open."

¶6. In his statement given to police, Jackson stated that he began stabbing Regina in the side while they were arguing. After that, referring to Sarah and the children, he said, "they all was coming at me and I just was stabbing." Elaborating, he stated:

> After I stabbed Regina, she kept coming and Sarah came in and I couldn't see her from the back. I know I stabbed her back there and they both got in front of me. I don't know if I stabbed her, but I was hitting back.

> Regina had a rod or something on hand, I guess up to the window or something. I know I seen her reach up to the window and pull something out. Regina was fighting at me with the rod. I . . . Yeah, it was a rod, an iron rod. I was stabbing at her. Sarah was at the back. Her and the other little kids were hollering and --- I guess they thought me and Regina was just into it, at first. She was hitting me with something. I don't know what Sarah had.

He had no specific recollection of stabbing the children.

¶7. Angelo Maurice Geens, Mrs. Jackson's cousin and neighbor, returned to his home at about 8:30 p.m. that night. Sarah ran to him from the bushes where she had been hiding and told him that Regina and the others were in the house; her uncle had killed them. Geens carried her into his mother's house and called the police and an ambulance. Deputy Sheriff J.B. Henry and Deputies Tindall, Berdin and Fondren arrived at the scene and discovered the children's bodies.

¶8. Sarah Jackson underwent surgery for five potentially serious stab wounds to her abdomen, chest and neck, including a lacerated windpipe. Regina suffered five serious stab wounds to her neck. Baby Andrea suffered a single penetrating stab wound to her neck which caused a tracheal injury and profoundly damaged her spinal cord. As a result, she is unable to walk and has no fine motor control in her arms.

¶9. Leflore County Coroner James R. Hankins pronounced the four children dead at the scene. The bodies were sent to the Deputy State Medical Examiner for forensic pathology examinations. Dr. Steven Hayne, who performed autopsies on the children, testified that Shunterica suffered three stab wounds to the neck and two shoulder abrasions. Her jugular vein was severed, leading Dr. Hayne to opine that she ultimately bled to death. Andrew sustained three stab wounds to the neck. The first cut through the carotid artery and the jugular vein. Another missed the trachea, but went into his backbone and severed the spinal cord. Dr. Hayne opined that such an injury "would require a considerable amount of strength" and noted the presence of a pinpoint hemorrhage caused by force

on the child's neck. Dominique, too, died of multiple stab wounds to the neck. Three of the four stab wounds cut her jugular vein and trachea. Antonio suffered four stab wounds and two slash wounds. His trachea was cut and Dr. Hayne determined that he died as a result of a chest wound which cut through his heart.

¶10. Meanwhile, Jackson had become the subject of an extensive manhunt. While still at the Jackson residence, Deputy Sheriff Tindall received a call from the Highway Patrol regarding a wrecked car in Eupora just fifty yards from the site where the Eupora Police Department had been conducting a routine license check. The 1977 green Monte Carlo bore a license tag registered to Martha Jackson's 1973 brown Ford station wagon. A wallet containing Jackson's identification was found on the front console and his own license tag as well as a long, dark trench coat were found in the truck of the vehicle.

¶11. Jackson had abandoned his car when he saw the roadblock and taken off on foot through the woods. Eluding canine search teams, he jumped a train from Eupora to West Point. On Monday morning, November 5, 1990, he turned himself in to the West Point Police Department. At that time, Jackson gave a statement to Leflore County Sheriff Ricky Banks, who had been summoned to West Point. He stated that, knowing his mother would be at church, he had gone to her house to get the safe because he needed more money to pay his bills. He had brought a kitchen knife with him that was in the car and when he heard someone in the house, went around the back to cut the telephone line. After stabbing Regina and the children, he tried to move the safe and to find a second safe she had mentioned. Noticing lights at the house across the street, he then climbed out the bathroom window and fled to his car, which was parked about two blocks away at Rising Sun High School.

¶12. On March 12, 1991, Jackson was indicted on four counts of capital murder, two counts of aggravated assault and one count of armed robbery by a grand jury of the Leflore County Circuit Court. Under Counts 1 through 4, Jackson was charged with the deaths of two-year-old Shunterica Lonnett Jackson, five-year-old Dominique Devro Jackson, three-year-old Antonio Terrell Jackson and two-year-old Andrew Odutola Kuyoro, Jr. In each count, he was charged with killing

> while said Henry Curtis Jackson, Jr. was engaged in the commission of the crime of felonious abuse and/or battery of a child . . . in violation of Section 97-5-39(2), Mississippi Code Annotated of 1972, as amended, or in any attempt to commit such felony; in violation of Section 97-3-19(2), Mississippi Code Annotated of 1972, as amended;

Counts 5 and 6 charged Jackson with the armed robbery of Regina Jackson and with "unlawfully, wilfully, feloniously and purposely caus[ing] bodily injury to Regina Jackson, a human being, by stabbing said Regina Jackson with a deadly weapon, to wit: a knife." Under Count 7, he likewise was charged with the stabbing of Sarah Denise Jackson.

¶13. Jackson was arraigned on April 29, 1991. He entered pleas of not guilty on all seven counts of the indictment.

¶14. Trial was set for August 26, 1991 in the Leflore County Circuit Court. During voir dire, Jackson's attorney and the circuit court questioned the jurors regarding their exposure to the extensive media coverage of the murders, especially during the days immediately before the trial, and its influence upon them. Based on the responses received, the circuit court advised Jackson's attorney

that if he sought a change of venue, it would be considered. On August 29, 1991, the circuit court entered an order changing venue to Copiah County and setting the trial for September 9, 1991.

¶15. A jury trial then was held in the Copiah County Circuit Court. The jury found Jackson guilty on all seven counts and sentenced him to death on each of the four capital murder counts.

¶16. On September 14, 1991, the circuit court signed an order sentencing Jackson to death by lethal injection on November 6, 1991 for each of the four counts of capital murder; thirty years in the custody of the Mississippi Department of Corrections for one count of armed robbery and twenty years each for the two counts of aggravated assault, with the latter three sentences to run consecutively. It was filed along with the September 14, 1991 J & V of Guilty on October 8, 1989. Jackson's motion to stay execution of the death sentences pending appeal was granted by the circuit court on October 19, 1991.

¶17. The circuit court granted Jackson's Motion to Allow Filing of Post-trial Motions After Preparation of Transcript. Jackson, however, filed no post-trial motions, accepted the convictions and orders of the circuit court as final and filed his notice of appeal on November 18, 1991 in the Copiah County Circuit Court.[(2)]

## ISSUES COMMON TO BOTH GUILT AND SENTENCING PHASES

### I. WHETHER THE CIRCUIT COURT ERRED IN MOVING JACKSON'S CASE FROM LEFLORE TO COPIAH COUNTY IN VIOLATION OF THE EQUAL PROTECTION CLAUSES OF THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS

¶18. After a jury was seated in Leflore County on August 26, 1991, Jackson's attorney sought a change of venue on grounds that pre-trial publicity surrounding the case might affect the fairness and impartiality of the jury. His motion, seeking transfer to a county with racial demographics similar to those in Leflore County, was granted and the proceedings were moved to Copiah County. He now complains that his equal protection rights were violated because Copiah County has a non-white population of fifty-one percent (51%), whereas the minority population in Leflore County is sixty-one percent (61%).

¶19. "The accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained; such doubt is implicit when there is strong public sentiment against the defendant." *Johnson v. State*, 476 So. 2d 1195, 1210-11 (Miss. 1985). In *Simon v. State*, 633 So. 2d 407, 412 (Miss. 1993), however, we rejected an appellant's claim that he was entitled to a trial in a county with precisely the same racial demographics as that in which his trial was initially set, noting that he had failed to make "a *prima facie* case that he was denied a trial by an impartial jury representing a fair cross-section of the community." Likewise, Jackson argues only that the demographics were not identical and has made no effort to establish a *prima facie* case that the jury did not represent a **fair** cross-section of the community from which it was selected. *Lanier v. State*, 533 So. 2d 473, 477 (Miss. 1988)(to show *prima facie* violation of the fair cross-section requirement, defendant must prove: exclusion of "distinctive" group; representation of this group neither fair nor reasonable in relation to community population; under-representation due to "systematic exclusion of the group in the jury-selection process."). *See also, Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 108

L.Ed.2d 536, 540-41(1940)("[a]lthough a defendant has no right to a jury of any particular racial composition, we have long held that the State cannot act so as to deprive a defendant of his right to a venire that is 'truly representative of the community'"). Jackson has not shown that he was deprived of a jury that was representative of the community. Indeed, the record does not even indicate the racial composition of the jury as seated. Accordingly, we find no merit to his argument.

## II. WHETHER THE CIRCUIT COURT ERRED IN DENYING JACKSON'S MOTION FOR A CONTINUANCE

¶20. Jackson asserts that the circuit court's refusal to grant his motion for a continuance made it impossible for him to obtain an adequate psychiatric evaluation by a psychologist or psychiatrist of his choice and to sufficiently prepare his defense. As his only meaningful authority, he cites *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), wherein the United States Supreme Court refused to acknowledge that an indigent defendant has a constitutional right to a psychologist or psychiatrist of his choosing or for funds to pay for such even where he has demonstrated that his sanity is at issue. *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66. Jackson's reliance on *Ake* avails him nothing and we find that he had more than adequate time in which to secure a thorough evaluation by his psychiatrist of choice, Dr. Timothy Summers.

¶21. Whether a continuance should be granted or denied is within the sound discretion of the trial court. *Johnson v. State*, 631 So. 2d 1985, 1989 (Miss. 1994); *Wallace v. State,* 607 So.2d 1184, 1190 (Miss. 1992); *Morris v. State*, 595 So. 2d 840, 844 (Miss. 1991). Only when manifest injustice appears to have resulted from the decision to deny the continuance should this Court reverse on that basis. *Johnson*, 631 So. 2d at 1989; *Hatcher v. Fleeman*, 617 So. 2d 634, 639 (Miss. 1993). To determine whether such manifest injustice has resulted from the circuit court's refusal to grant Jackson's motion for a continuance, we turn to the chronology of events surrounding his efforts to secure an evaluation by a psychiatrist of his choice.

¶22. On April 10, 1991, the State filed a Motion for Mental Examination to determine whether Jackson was competent to stand trial as well as whether he was sane at the time of the crime. From the transcript of the April 12, 1991 motions hearing, it appears that Jackson, too, had filed such a motion. The record, however, contains no such motion. At the April 29, 1991 motion hearing, the circuit judge stated that he would enter an order naming the Court's psychiatrist and psychologist to examine Jackson for limited purposes.

¶23. On June 10, 1991, the circuit court issued an order requesting that both parties submit requests for special tests and areas of exploration they sought from a court-appointed psychologist or psychiatrist. An order for examination by Dr. Robert McKinley, a psychiatrist, and Dr. Michael Whalen, a psychologist, was then entered on June 19, 1991. Nevertheless, Jackson's first apparent objection to Drs. McKinley and Whelan only arose in his Motion to Proceed Ex Parte, filed on August 21, 1991, five days before the original trial date. Jackson's attorney indicated at that time that he had wanted to retain the services of a Dr. Kallman, whom, he maintained, "could assist in an advocacy role."

¶24. At proceedings in chambers on August 26, 1991, the first day of the originally-scheduled trial in Leflore County, Jackson's attorney indicated that he had not been able to retain Dr. Kallman or any of the other psychiatrists or psychologists of his choice. Contrary to the wishes of his client, he asked

for a continuance. Later in those proceedings, Walls indicated that he had not yet had an opportunity to develop an insanity defense. The State noted that despite its requests for a notice of insanity defense, none had been forthcoming.

¶25. On September 10, 1991, before the transferred trial in Copiah County, Jackson's attorney again sought a continuance. The State, objecting, pointed out that it had been asking the defense about a notice of insanity defense since April 24. Walls then stated that he had filed a notice the Friday before trial, without knowing what the results of Dr. Summers' evaluation would be.

¶26. The circuit court then overruled the motion for a continuance. Jackson's insanity defense was then withdrawn before the proffer of Dr. Summers' testimony in the guilt phase of the trial. In refusing to admit Dr. Summers' testimony at that time, the circuit court indicated that its decision was based on the content of his testimony, not because of the abandonment of the insanity defense.

¶27. Given the five-month time frame in which Jackson's attorney could have filed a notice of insanity defense, voiced his objections to the evaluations by the court-appointed doctors or taken other measures to secure evaluations by psychiatrists or psychologists of his choice, and the fact that he found it necessary to withdraw the insanity defense after obtaining Dr. Summers' evaluation, we cannot say that manifest injustice resulted from the refusal to grant the continuance.

### III. WHETHER THE CIRCUIT COURT FAILED TO CONDUCT AND PREVENTED DEFENSE COUNSEL FROM CONDUCTING ADEQUATE VOIR DIRE OF VENIRE MEMBERS

¶28. Jackson next attacks the adequacy of the circuit court's questioning of jurors' attitudes toward the death penalty during voir dire. He contends that six black venire members were improperly dismissed before they could be questioned adequately by the defense and that there was a risk that others served who otherwise properly might have been excluded had he been allowed to question them more thoroughly.

¶29. *Witherspoon v. Illinois*, 391 U.S. 510, 88. S.Ct. 1770, 20 L.Ed. 2d 776 (1968) provides that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 20 L.Ed.2d at 784-785. Further, in *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed. 2d 492 (1992), the United States Supreme Court stated that the *Witherspoon* principles "demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting." *Morgan*, 119 L.Ed. 2d at 504. The standard to be followed is "whether the juror's views 'would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 433, 105 U.S. 844, 83 L.Ed.2d 841, 857 (1985), *quoting Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In *Wainwright*, the Supreme Court further explained:

> this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the

point where there bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. [footnote omitted]. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror.

*Wainwright*, 83 L.Ed. 2d at 852-853. The standards articulated in *Wainwright* were adopted by this Court in *Fuselier v. State*, 468 So. 2d 34, 53 (Miss. 1985).

¶30. In *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), we reiterated the importance of fully developing jurors' views toward the death penalty, stating "[w]e have directed that, notwithstanding a prospective juror's scruples, the court should inquire further whether the juror would follow its instructions and a fair verdict render according to the law and the evidence." *Id*. at 128. *See also, Fuselier*, 468 So. 2d at 53-55. Further, while the circuit court is expected to take the lead in conducting the *Witherspoon* voir dire in death penalty cases, this does not mean that counsel does not also have a role. *Hansen*, 592 So. 2d at 128-129. Thus, in *Hansen*, where the circuit court expressly refused to allow the defendant's attorney to voir dire two venire members who had expressed opposition to the death penalty, we stated:

There appears no escape from the fact that the Circuit Court erred when it denied counsel's request for voir dire examinations of jurors Hulitt and Nichols. [citations omitted]. On the other hand, the answers these two jurors gave are substantially clear, and it appears reasonably certain that each was *Witherspoon*-excludable. As we may do, we afford a measure of deference on this point to the court that saw and heard the jurors. *Wainwright v. Witt*, 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 853; *Woodward v. State*, 533 So. 2d 418, 424 (Miss. 1988). Speculating, but with the aid of a touch of common sense, we regard the likelihood that voir dire examination by defense counsel would have rehabilitated these jurors to bring them out of *Witherspoon* is, on this record, rather slim. We hold the error harmless beyond a reasonable doubt and that, as such, it does not require reversal.

*Hansen*, 592 So. 2d at 129.

¶31. Our examination of the record indicates only that the circuit court declined to allow Jackson's attorney to repeat questions in his own words to the prospective jurors during the court's voir dire. The circuit judge, however, did attempt to rephrase his questions as requested by the defense. Further, Jackson's attorney did not request permission to further question the jurors; he objected only to their dismissal. Even assuming *arguendo* that the circuit court erred in not allowing the defense to rephrase and pose the questions to the jury, a common sense interpretation of the record, as urged by *Wainwright* and *Hansen*, does not indicate that further questioning would have rehabilitated the six venire members who expressed their opposition to the death penalty. Moreover, Jackson's attorney conducted his own extensive voir dire of the remaining venire members regarding the death penalty, refuting his contention that there existed a risk of seating jurors who might have been unduly biased in favor of the death penalty. We find no error here.

¶32. Jackson further argues that the circuit court erred in refusing to allow him to question

individually a venire member who was a justice court judge running for reelection. However, he cites no authority and presents no meaningful argument to support this assignment of error. Accordingly, we do not consider it. *Russell v. State*, 607 So. 2d 1107, 1117 (Miss. 1992).

IV. and V. WHETHER THE CIRCUIT COURT ERRED IN OVERRULING JACKSON'S *BATSON* CHALLENGES AND IN FAILING TO REQUIRE NON-DISCRIMINATORY REASONS FOR THE GENDER-BASED EXCLUSION OF CERTAIN VENIRE MEMBERS

¶33. Jackson next raises a multi-part assault upon the prosecutor's use of eight peremptory challenges against black venire members, contending that the strikes were made in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[3] He asserts that a) the circuit court's inability to retrieve questionnaires completed by all of the 165 potential jurors amounts to a failure to preserve the record sufficiently to protect his fourteenth amendment rights; b) the prosecutor's reasons for striking several jurors were insufficient to rebut the *prima facie* presumption of *Batson*; c) her reasons for striking other prospective jurors were inherently suspect; d) the reasons offered were inadequately developed on voir dire; e) the reasons offered were based on characteristics shared by white venire members not challenged by the prosecution; f) the circuit court failed to require legitimate non-discriminatory justification for the prosecutor's peremptory strikes; g) the judge applied an incorrect standard of law in ruling on whether the prosecutor's challenges were race-neutral; and h) the defense was not given adequate opportunity to rebut the prosecutor's challenges.

¶34. The record, however, does not reflect the racial composition of the jury as seated. The race of prospective jurors is not indicated on questionnaires, which were designed by the defense and completed prior to trial, and is noted only where specifically requested by the defendant in several instances during the jury selection process, when those individuals were struck from the venire by either party. In *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), where the record likewise did not indicate the race of the jurors, this Court rejected the appellant's *Batson* challenges, noting that it "'must decide each case by the facts shown in the record, not assertions in the brief . . .'" *Hansen*, 592 So. 2d at 127, *citing Burney v. State*, 515 So. 2d 1154, 1160 (Miss. 1987), and further that, the burden is on the appellant to make sure that the record contains "'sufficient evidence to support his assignments of error on appeal.'" *Id*.

¶35. For the first time on appeal, Jackson further asserts that the State used eight of its peremptory challenges to remove women from the jury without offering a non-gender based justification for so doing. The assignment of error is procedurally barred by his failure to make a timely objection at trial. *Russell v. State*, 607 So. 2d 1107, 1117 (Miss. 1992); *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992). Even looking at the merits of the issue, we note that in *Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994), we made a point of bringing to the trial courts' attention the United States Supreme Court's decision in *J.E.B v. Alabama*, __U.S. __, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89, 107 (1994), which extended *Batson* to gender-based exclusion of jurors. The *J.E.B*. decision explained that

Failing to provide jurors the same protection against gender discrimination as race discrimination could frustrate the purpose of *Batson* itself. Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination. [footnote

omitted] Allowing parties to remove racial minorities from the jury not because of their race, but because of their gender, contravenes well-established equal protection principles and could insulate effectively racial discrimination from judicial scrutiny.

128 L.Ed.2d at 107. In applying its decision, the Court instructed that "[a]s with race-based *Batson* claims, a party alleging gender discrimination must make a *prima facie* showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike." *J.E.B.*, 128 L.Ed.2d at 106-107. Referencing *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the Court further held that "[w]hen an explanation is required, it need not rise to the level of a 'for cause' challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual." *J.E.B.*, 128 L.Ed.2d at 107.

¶36. Jackson, however, has failed totally to make a *prima facie* case of gender-based discrimination in the selection of his jury. To the contrary, our review of the record indicates that ten of the fourteen jurors and alternates were women! Accordingly, even notwithstanding the procedural bar, there is no merit to his argument.

## VI. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING A WITNESS FOR THE PROSECUTION TO REMAIN IN THE COURTROOM DURING TRIAL PROCEEDINGS

¶37. Jackson contends that the presence of Sheriff Ricky Banks, a witness for the State, in the courtroom throughout the proceedings violated the rule of sequestration and warrants reversal of his convictions and sentences. The record indicates that Sheriff Banks left the courtroom during the testimony of investigating officer, Leflore County Chief Deputy Sheriff Jimmy Tindall, but that he was present during the testimony of Eddie Self, whose testimony, Jackson asserts, he was then called to rebut.

¶38. Rule 615 of the Mississippi Rules of Evidence authorizes exclusion of witnesses from the courtroom to keep them from hearing testimony of other witnesses except for "(1) a party who is a natural person, or (2) **an officer or employee of a party which is not a natural person designated as its representative by its attorney**, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause." Miss. R. Evid. 615 (emphasis added). While Jackson asserts that the State made no request for the sheriff to be designated as its representative, the record shows that such request was, indeed, made by the State and granted by the circuit court. The State, therefore, contends that because Sheriff Banks was so designated, there is no merit to Jackson's argument. The Comment to Rule 615 notes that in each instance of exclusion, the person's presence must be "'shown by a party to be essential to the presentation of his case.'" Addressing the specific application of the Rule to sheriffs, we have held:

> The sheriff was not exempted from the Rule simply by virtue of his being the Sheriff, **unless, under category (2) of the Rule's exceptions, the Sheriff is designated by the District Attorney as the state's representative because as the chief investigating officer in the case, his presence in the courtroom is necessary to assist the prosecution at trial.**

*Douglas v. State*, 525 So. 2d 1312, 1316-1317 (Miss. 1988)(emphasis added). *See also, Russell v. State*, 607 So. 2d 1107, 1113 (Miss. 1992)(quoting *Douglas* to find that presence of chief investigator at counsel table in capital murder case did not inject sympathy into the jury's decision).

The State made no showing that Banks was the chief investigating officer in this case or that his presence was "necessary to assist the prosecution at trial." The prosecutor merely stated, "I just feel for security purposes the Sheriff should be allowed to remain."

¶39. It appears to us that the State was attempting to circumvent the sequestration rule when it made the apparently impromptu decision to designate Sheriff Banks as its representative after Jackson raised an objection to his presence in the courtroom at the beginning of voir dire. However, in determining whether the circuit court abused its discretion in allowing him to testify, we have stated:

> We note that the majority of federal appellate courts have stated the test thus: failure of a judge to order a mistrial or to exclude testimony will not justify reversal on appeal absent a showing of prejudice sufficient to constitute abuse of discretion. *U.S. v. Lassiter*, 819 F.2d 84, 87 (5th Cir. 1987); *U.S. v. Buchanan*, 787 F.2d 477, 485 (10th Cir. 1986); *U.S. v. Ortega-Chavez,* 682 F.2d 1086, 1089 (5th Cir. 1982); *U.S. v. Warren,* 578 F.2d 1058, 1076 (5th Cir. 1978). Such a test is consistent with our unflagging support of the trial court's power to control the progress of a trial.

*Douglas*, 525 So. 2d at 1318. We will not "*per se* reverse a trial court for failing to order a mistrial after a witness exclusion rule violation. The resultant degree of prejudice to the defendant must first demonstrate that the trial court abused its discretion." *Baine v. State*, 1076, 1083 (Miss. 1992). *See also, Gerrard v. State*, 6119 So. 2d 212, 217 (Miss. 1993).

¶40. While we find that the reasons for allowing Sheriff Banks to remain in the courtroom to be less than compelling, Jackson has failed to demonstrate any prejudice resulting from the sheriff's presence or his testimony. Banks' "rebuttal" of Self's testimony was limited to two questions which recounted his questioning of Self regarding the contents of the safe. Jackson's only objection to the testimony at trial was that it was hearsay. Chief Deputy Sheriff Tindall, whose testimony Sheriff Banks was not present for, recounted precisely the same details of the conversation the two had had with Self when opening the safe. Again, Jackson objected only on grounds of hearsay.

¶41. We condone neither the State's efforts to thwart the purposes of the rule of sequestration nor the practice of allowing in the courtroom throughout the trial law enforcement officers who will be testifying in a case. However, there being no prejudice to Jackson in this particular case, we find that any error was harmless.

> VIII. WHETHER THE SUBSTANCE AND NATURE OF THE PROSECUTOR'S COMMENTS AND ARGUMENTS VIOLATED JACKSON'S RIGHTS, MISINFORMED AND MISDIRECTED JURORS ON THE LAW AND THE FACTS, AND DEPRIVED HIM OF A FAIR TRIAL

¶42. Jackson contends that various comments made by the prosecution during opening and closing arguments, as well as while examining witnesses, were improper and mandate the reversal of his sentence and conviction. Jackson made no contemporaneous objections to the comments or lines of questioning now complained of. Accordingly, his arguments are procedurally barred. *Chase v. State*, 645 So. 2d 829, 854 (Miss. 1994); *Hansen v. State*, 592 So. 2d 114, 139-140 (Miss. 1991). Moreover, "[t]he defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal." *Foster v. State*, 639 So. 2d 1263, 1289 (Miss. 1994).

¶43. Even when, as in the case *sub judice*, no contemporaneous objections have been raised, reversal may be necessary when the prosecution has improperly alluded to the defendant's failure to testify. *Foster*, 639 So. 2d at 1290; *Griffin v. State*, 557 So. 2d 542, 552 (Miss. 1990); *Livingston v. State*, 525 So. 2d 1300, 1306-07 (Miss. 1988). Jackson claims that the prosecution made such statements and pursued questioning which improperly drew the jury's attention to his choice not to take the witness stand. We, however, find no such allusions in the portions of the trial transcript cited by the appellant.

> IX. WHETHER THE CIRCUIT COURT ERRED IN FAILING TO MAKE A COMPLETE RECORD OF THE INSTRUCTIONS OF LAW UPON WHICH JURORS WERE TO RELY IN DETERMINING THEIR VERDICTS

¶44. Jackson alleges that the circuit court failed to present this Court with a complete record of the instructions presented to the jury during both the guilt and sentencing phases of the trial. He claims, therefore, that it is impossible to review errors he has raised regarding various jury instructions. However, "it is the duty of the appellant to see that the record of the trial proceedings wherein error is claim[ed] is brought before this Court." *Smith v. State*, 572 So. 2d 847, 849 (Miss. 1990); *Burney v. State*, 515 So. 2d 1154, 1160 (Miss. 1987); *Robinson v. State*, 345 So. 2d 1044, 1045 (Miss. 1977). A transcript of the circuit court's instructions to the jury, which Jackson complained was absent from the record, was prepared and added to the appellate record upon the State's motion. Further, Jackson neither specified which of the refused jury instructions were omitted nor made any effort to supplement the record. Accordingly, we do not consider this assignment of error.

### GUILT PHASE

> X. WHETHER THE TRIAL COURT ERRED BY PROHIBITING THE EXPERT PSYCHIATRIC TESTIMONY OF DR. SUMMERS AT THE GUILT PHASE OF MR. JACKSON'S TRIAL

¶45. As discussed in Issue II, *supra*, Jackson unsuccessfully sought a continuance to obtain further evaluation and testimony by his psychiatrist of choice, Dr. Timothy Summers. He further complains that circuit court erred in limiting Dr. Summer's proffered testimony to the sentencing phase of the trial, asserting that it was critical to the guilt phase so to enable the jury to make a determination of the issues of Jackson's sanity and whether he had the requisite specific intent to commit the crime of felonious child abuse. However, by the time Jackson sought to introduce the testimony, he had already abandoned the insanity defense. We find no error, therefore, in the exclusion of the testimony.

> XI. WHETHER THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON AN OFFENSE FOR WHICH THE JURY WAS AUTHORIZED TO FIND JACKSON GUILTY

¶46. Jackson was indicted and found guilty of four counts of capital murder, killing while engaged in the commission of child abuse and/or battery, pursuant to Miss. Code Ann. § 97-3-19(2)(f). The statute provides in relevant part:

> **§ 97-3-19. Homicide; murder defined; capital murder**

(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

(f) When done with or without design to effect death, by any person engaged in the commission of the crime of felonious abuse or battery of a child in violation of subsection (2) of section 97-5-39, or in any attempt to commit such felony;

Miss. Code Ann. § 97-5-39 provides that "any person who shall intentionally (a) burn any child, (b) torture any child or, (c) except in self-defense or in order to prevent bodily harm to a third party, whip, strike, or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child . . ." One act alone may constitute abuse and/or battery; the "statute does not require that the abuse be dispensed over a period of time before a charge for felonious abuse will arise." *Faraga v. State*, 514 So. 2d 295, 302 (Miss. 1987).

¶47. In *Faraga*, this Court rejected a merger doctrine challenge to § 97-3-19(2)(f) and reiterated that "[t]he intent of the Legislature was that serious child abusers would be guilty of capital murder if the child died." 514 So. 2d at 302. Thus, Faraga's capital murder conviction for the death of his two-month old infant was affirmed. In *Butler v. State*, 608 So. 2d 314 (Miss. 1992), where a mother appealed her conviction under § 97-3-19(2)(f) for the death of her nine-month old son who died of internal injuries after she punched him in the abdomen when he would not stop crying, this Court held that she was entitled to a lesser included offense instruction on manslaughter pursuant to Miss. Code Ann. § 97-3-27. That statute provides:

### § 97-3-27. Homicide; killing while committing felony.

The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson or robbery, or while such is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

Finding that in addition to § 97-3-119(2)(f), conviction was authorized under § 97-3-27 for the killing of an infant in the course of felonious child abuse, the *Butler* Court stated:

If Miss. Code Ann. § 97-3-19(2)(f) required, in order to convict, that the killing have been intentional, then clearly Butler would have been entitled to a manslaughter instruction based on Miss. Code Ann. § 97-3-27 as a lesser included offense, the only ingredient lacking being intent. Should she be deprived of such instruction when the statutes, as in this case, are for all intents and purposes identical? *Mease v. State*, 539 So. 2d 1324, 1329-30 (Miss. 1989); see also *Mackbee v. State,* 575 So. 2d 16, 23 (Miss. 1990); *Harper v. State*, 478 So. 2d 1017, 1021 (Miss. 1985).

It is well established that when there are two separate criminal statutes for the same offense, the State has a choice of deciding the statute under which to prosecute. *Rowland v. State*, 531 So. 2d 627, 631-32 (Miss. 1988); *Craig v. State,* 520 So. 2d 487, 491 (Miss. 1988); *Cumbest v. State,* 456 So. 2d 209, 223 (Miss. 1984). It is also settled that in such cases the accused is not entitled to have the jury instructed on the statute carrying the lesser penalty. Identical offenses do not authorize the lesser included offense instructions. *Rowland*, 531 So. 2d at 631-32. We

do not depart from these principles in the general run of criminal prosecutions.

In this case, however, we have a defendant who, under the capital murder statute, was sentenced to death when there was another criminal statute for the same offense with the maximum penalty of twenty years imprisonment. Compare Miss. Code Ann. §§ 97-3-25 (1972), 97-3-21(Supp. 1991).

We conclude that Butler was entitled to have the jury instructed that she could be convicted under Miss. Code Ann. § 97-3-27, the manslaughter statute.

For over half a century, this Court has approved circuit courts granting heat of passion manslaughter instructions to the State in a homicide prosecution which is either murder or justifiable homicide committed in lawful self defense, and there is no element whatever of a heat of passion slaying under Miss. Code Ann. § 97-3-35 (1972). *See Mease v. State*, 539 So. 2d at 1338 (Hawkins, P.J., concurring). It is not an even-handed administration of justice in turn to deny the defense a manslaughter instruction where the accused, as is the case here, could have been lawfully indicted and prosecuted for manslaughter as easily as capital murder. And especially is this true where one verdict can bring a sentence of death and the other a maximum of twenty years imprisonment. Indeed, we do not think any prosecuting attorney should have it in his power to prosecute a defendant for capital murder when the same offense could be prosecuted under a statute with less severe penalty and also prevent a jury from considering when she should be found guilty only under the statute carrying the lesser punishment.

*Butler*, 608 So. 2d at 319-320.

¶48. Jackson argues that in light of *Butler,* he was entitled to a manslaughter instruction pursuant to Miss. Code Ann. § 97-3-27. At trial, Jackson objected to Instruction C-CR-7 because

it does not provide for the jury to consider murder or manslaughter and the defendant believes the Court should grant him instructions on the lesser included offenses of both murder and manslaughter. This instruction as to Counts 1 through 4, are virtually peremptory on the question of capital murder.

The State countered that it relied on the *Faraga* decision's one-act rule in turning to the capital murder statute.

¶49. Jackson further contends that the evidence justifies a lesser-included offense instruction pursuant to Miss. Code Ann. § 97-3-35. We disagree. A lesser-included offense instruction is required only "where a reasonable juror could not on the evidence exclude the lesser-included offense beyond a reasonable doubt." *Mackbee v. State*, 575 So. 2d 16, 23 (Miss. 1990); *Boyd v. State*, 557 So. 2d 1178, 1181 (Miss. 1989). § 97-3-35 provides as follows:

**§ 97-3-35. Homicide; killing without malice in the heat of passion.**

The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law and not in necessary self-defense, shall be manslaughter.

Jackson's statement to police indicates that he planned the robbery believing that his mother and the rest of the household would be at church. His attorney conceded that the only evidence to support a heat of passion manslaughter instruction was that Jackson had gotten into a fight with Regina because she did not know the combination to the safe. However, although he used Andrea as a shield while he and Regina were struggling, there is no evidence that he stabbed the baby or killed the other children at that time. Especially in light of Jackson's comment to Regina that he had come to kill them previously and was going to kill them that night, we find no basis for the requested instruction.

¶50. Jackson further contends that the circuit court's failure to grant a lesser-included offense instruction under either § 97-3-37 or § 97-3-35 violated his eighth amendment rights. He relies upon *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) for the proposition that the United States Supreme Court's "fundamental concern in *Beck v. Alabama,* 447 U.S. 625 (1980)] was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Schad*, 115 L.Ed.2d at 574. However, the jury in the case *sub judice* was instructed that Jackson could be sentenced to life in prison.

> XII. WHETHER THE OVERLAP BETWEEN MISS. CODE ANN. § 97-3-19(2)(f) AND § 97-3-27 GIVES PROSECUTORS AND JURIES UNFETTERED DISCRETION TO IMPOSE EITHER THE DEATH PENALTY OR CONVICT OF MANSLAUGHTER, AND THUS VIOLATES THE EIGHTH AMENDMENT

¶51. Jackson next asserts that the existence of two separate statutes under which an individual might be prosecuted for killing during the course of committing the crime of felonious child abuse "fails to provide a principled way to distinguish the few cases in which the death penalty is to be imposed from the many in which it is not." However, conviction for capital murder does not automatically result in the death penalty. *In re Jordan*, 390 So. 2d 584, 586-587 (Miss. 1980). The jury in Jackson's trial was instructed that it could impose a life sentence. Because "the capacity of prosecutorial discretion to provide individualized justice is 'firmly entrenched in American law,'" we therefore find no merit to this assignment of error. *Ladner v. State*, 584 So. 2d 743, 751 (Miss. 1991)(*quoting McCleskey v. Kemp*, 481 U.S. 279, 311-12, 107 S.Ct. 1756, 1777-78, 95 L.Ed.2d 262, 291 (1987)); *See also, Butler v. State*, 608 So. 2d 314 (Miss. 1992)(lesser offense of manslaughter instruction in cases where child is killed in the course of felonious abuse and/or battery, provides safeguard for defendant).

> XIII. WHETHER THE TRIAL COURT'S INSTRUCTION TO THE JURY ON THE CRIME OF FELONIOUS CHILD ABUSE IS VAGUE, OVERLY BROAD AND INSUFFICIENT TO SUPPORT THE JURY'S VERDICT

¶52. Jackson variously contends that "the felonious child abuse statute is void for vagueness under the Eighth or Fourteenth Amendments, the instructions given to the jury did not sufficiently narrow the definition of child abuse and the State exploited these constitutional infirmities in closing argument." He made no objections at trial either to the alleged vagaries of the statute or to the State's comments in closing arguments. Further, he provides no apparent argument for his contention that the language "serious bodily harm" as used in both the statute and the instruction is very broad.

Accordingly, this issue is procedurally barred. **Russell v. State**, 607 So. 2d 1107, 1117 (Miss. 1992); **Hansen v. State**, 592 So. 2d 114-115 (Miss. 1991).

XIV. WHETHER THE TRIAL COURT FAILED TO PROPERLY AND ADEQUATELY INSTRUCT THE JURY CONCERNING THE EVIDENCE ON COUNT FOUR

¶53. Count Four of the indictment charged Jackson with the murder of Andrew Kuyoro. Because neither Sarah nor Regina Jackson actually saw Jackson stab Andrew, he contends that evidence that he killed the child is purely circumstantial. Thus, he argues, First Phase Instruction S-2 failed to correctly instruct the jury on the evaluation of circumstantial evidence. In relevant part, Instruction S-2 provides as follows:

> As to Count 4 of the indictment charging the capital murder of Andrew Odutola Kuyoro, Jr., if you believe from the evidence in this case **beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence** . . . the Defendant . . . was engaged in or attempting to engage in the felonious abuse and/or felonious battery of Andrew . . . and if you further believe from the evidence in this case **beyond a reasonable doubt** that on that date, the Defendant . . . did unlawfully, wilfully, feloniously and of his malice aforethought, kill and murder Andrew. . . while so engaged or attempting to engage in the felonious abuse and/or felonious battery of said child, then it is your sworn duty to find the Defendant . . . guilty of capital murder as charged in Count 4 of this indictment.

¶54. In circumstantial evidence cases, "the state is required to 'prove the accused's guilt not only beyond a reasonable doubt, but to the exclusion of every other hypothesis consistent with innocence.'" **Isaac v. State**, 645 903, 909 n.7 (Miss. 1994), *quoting* **Leflore v. State**, 535 So. 2d 68, 70 (Miss. 1988). Jackson now complains that the language "and to the exclusion of every other reasonable hypothesis consistent with innocence" was used only with regard to felonious child abuse and not in connection with the capital murder charges. He neglects to point out, however, that two other jury instructions instructed the jury as to the circumstantial nature of the evidence surrounding Count Four. The jury having been so instructed through Instructions C-CR-3 and C-CR-5, as well as through S-2, we find that no error resulted from the wording of Count Four of Instruction S-2.

XV. WHETHER THE TRIAL COURT ADOPTED AN IMPROPER STANDARD TO REVIEW THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT A LESSER INCLUDED OFFENSE INSTRUCTION OF SIMPLE ASSAULT

¶55. Jackson was indicted and convicted of two counts of aggravated assault for his attacks upon Regina and Sarah Jackson. He was denied a lesser included offense instruction on simple assault despite his argument that there was nothing in his confession that he "intentionally" stabbed anybody.

¶56. Once a deadly weapon is introduced, the distinction between simple and aggravated assault, as defined by Miss. Code Ann. § § 97-3-7(1) and (2) (1994), hinges upon whether the injuries were inflicted negligently or intentionally. **Hutchinson v. State**, 594 So. 2d 17, 20 (Miss. 1992). Therefore, we have held that whether a lesser offense instruction should be given turns on whether there exists an evidentiary basis for it. **Id**. at 18. Evidence introduced about the events leading to Regina's and Sarah's injuries leaves little room for a jury to find that Jackson was merely negligent in his handling of a knife that evening. Moreover, when serious or substantial bodily harm has resulted,

we have been inclined to hold that the case is definitely one of aggravated assault. ***Hutchinson,*** 594 So. 2d at 20 (but, conversely, minor injuries do not mandate that a case is one of simple assault); ***Harbin v. State,*** 478 So. 2d 796, 800 (Miss. 1985); ***Colburn v. State,*** 431 So. 2d 1111, 1114 (Miss. 1983). The multiple stab wounds suffered by both Regina and Sarah were serious and life-threatening. That, coupled with an absence of evidence suggesting that Jackson was merely negligent in his handling of the knife, compels us to find that the jury was properly instructed.

## SENTENCING PHASE

XVI. WHETHER THE TRIAL COURT ERRED IN ADMITTING AUTOPSY PHOTOGRAPHS OF THE VICTIMS TO "MORE GRAPHICALLY" DEPICT INJURIES AND WHICH HAD A PREJUDICIAL EFFECT ON THE JURY OUTWEIGHING THEIR PROBATIVE VALUE

¶57. Jackson asserts that the trial court erred by allowing the introduction of photographs taken at the morgue of the slain children, which were introduced during the testimony of pathologist Dr. Steven Hayne to illustrate the severity of the children's wounds and the pain and suffering associated with them. We find no merit, however, to his contention that the evidence was unnecessary, repetitious or inflammatory to jurors.

¶58. The admission of photographs is within the discretion of the trial judge and his decision will be upheld absent an abuse of that discretion. ***Hart v. State,*** 637 So. 2d 1329, 1335-1336 (Miss. 1994); ***Noe v. State,*** 616 So. 2d 298, 303 (Miss. 1993). However, "[a]utopsy photographs are admissible only if they possess probative value." ***Noe,*** 616 So. 2d at 303; ***McNeal v. State***, 551 So. 2d 151, 159 (Miss. 1989). Further, they must not be so gruesome or used in such a way as to be overly inflammatory or prejudicial. ***Hurns v. State***, 616 So. 2d 313, 319 (Miss. 1993); ***Sudduth v. State***, 562 So. 2d 67, 70 (Miss. 1990). Indiscriminate use of autopsy photographs showing where "a medical technician or pathologist has used the tools of his trade to puncture, sever, dissect and otherwise traumatize body parts" is discouraged. ***Noe***, 616 So. 2d at 303.

¶59. The six 4"x 6" color photographs in question depict the fatal stab wounds to the neck and face of Dominique Jackson, the neck of Shunterica Jackson, the neck of Andrew [Jackson] Kuyoro and the chest of Antonio Jackson. Taken after the bodies had been cleaned up but before the autopsies were performed, they are neither gruesome nor inflammatory. They show only the immediate areas of the wounds. Dr. Hayne used the photographs in conjunction with styrofoam head models to demonstrate the location and extent of the wounds as well as the nature and extent of the pain and suffering experienced by the victims before they died.

¶60. We have found such pictures to have probative value in showing the location and number of wounds, the extent of the force or violence involved and the defendant's state of mind. ***Noe***, 616 So. 2d at 303-304; ***Marks v. State***, 532 So. 2d 976, 981 (Miss. 1988); ***Cardwell v. State***, 461 So.2d 754, 760 (Miss. 1984). *See also,* ***Welch v. State***, 566 So. 2d 680, 685 (Miss. 1990)(pictures of dissected cadaver not admissible because they did **not** show "circumstances surrounding death, the cruelty of the crime, the place of the wounds, or the extent of the force or violence used"). Further, even when autopsy photographs have been held inadmissible during the guilt phase, they have been admissible, as in the case *sub judice*, during the sentencing phase "on the issue of whether the crime was heinous,

atrocious or cruel." ***Shell v. State***, 554 So. 2d 887, 902 (Miss. 1989). Accordingly, we find no abuse of discretion in admitting the photographs.

> XVII. WHETHER THE TRIAL COURT ERRED IN ALLOWING EXPERT TESTIMONY ON AN ULTIMATE ISSUE OF LAW
>
> XVIII. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW DEFENSE COUNSEL TO QUESTION EXPERT PSYCHOLOGICAL WITNESSES ABOUT THE EFFECTS OF JACKSON'S RELUCTANCE TO COOPERATE IN INTERVIEWS
>
> XIX. WHETHER IT WAS ERROR TO RESTRICT THE TESTIMONY OF DR. SUMMERS CONCERNING INFORMATION ON WHICH HE BASED HIS DIAGNOSIS

¶61. Jackson raised several issues concerning the admissibility of testimony presented by the court-appointed independent psychologist, Dr. Michael Whalen, as well as the restriction of testimony by his psychiatrist of choice, Dr. Timothy Summers.

¶62. Dr. Whelan testified during the sentencing phase of the trial that Jackson was not insane at the time of the crime. When questioned on cross-examination by the State regarding the three mitigating factors he had found, Dr. Whelan responded as follows:

> Q. [By Mr. Crook] If I am understanding your report to the Court and your testimony, his actions and emotions that you found to be present had nothing to do with his responsibility is that correct?
>
> A. Not in a legal sense, no. Neither you nor Mr. Walls has really asked me to explain my psychological testing and why that led him to do what he did. But, in a legal sense, no. He is responsible for what he did.

Jackson asserts that Dr. Whelan's statement was prejudicial and "irrelevant to sentencing, confusing to jurors on the nature of mitigation, and improper as expert opinion testimony on an ultimate issue of law." However, Jackson made no objection to the testimony at trial. Accordingly, his argument is procedurally barred by his failure to make a timely objection. ***Cole v. State***, 525 So. 2d 365, 369 (Miss. 1987).

¶63. Jackson next contends that he was denied his constitutional right to cross-examine a witness after the circuit court sustained the State's objection to his questioning of Dr. Whalen. However, Jackson's attorney first questioned Dr. Whelan as to whether Jackson was cooperative during interviews **on direct examination and not on cross-examination,** ascertaining that Jackson "co-operated on some things and he lied on others." On re-direct, Jackson's attorney queried Dr. Whelan as to whether he was aware "that people who have been charged with offenses that many times their attorneys tell them not to talk to anyone about their charge."

¶64. The circuit court ultimately sustained the State's immediate objection to the question as being outside the scope of cross-examination.[(4)] Away from the jury, the circuit court asked Jackson's attorney to repeat his question, whereupon he stated:

> I asked him if he was not aware that many times when people are charge[d] with offenses, their

attorneys will tell them not to talk to anyone about their offenses. The reason I am asking the question is because Noel [Crook] extensively went into whether or not he [Jackson] cooperated with Dr. Whelan. Dr. Whelan is a member of the Mississippi Department of Corrections. I think if I can show that the man didn't fully cooperate with him because he works for the Mississippi Department of Corrections and I had advised him not to talk about his case. I think I am entitled to show that.

¶65. In *Evans v. State*, 499 So. 2d 781 (Miss. 1986), we set forth the parameters of re-direct examination as follows:

> Generally, the scope and extent of re-direct examination is within the discretion of the court. 6 Wigmore, Evidence § 1896 (Chadbourn Rev. 1976); 98 C.J.S. Witnesses § 419 (1957). Thus, rulings of the trial court pertaining to redirect will not be disturbed unless there has been a clear abuse of discretion. *Wharton's Criminal Evidence*, § 451 (13 ed. 1972). See also Rule 611(a), Miss.R.Ev., effective January 1, 1986. Although the scope of re-direct is largely within the discretion of the court, R. 508, Miss.Unif.Crim.R.Cir.Ct.P. provides that "[r]edirect examination is limited to matters brought out on cross-examination." R. 5.08, Miss.Unif.Crim.R.Cir.Ct.P.

*Id.* at 782-783. On cross-examination, the State questioned Dr. Whelan about his statement that Jackson had cooperated on some things and lied on others.[5] That option was available to Jackson as well. He did not take advantage of it. Only on re-direct, for the first time, did the defense broach the subject of what factors Dr. Whelan was aware of which possibly might have influenced the psychologist-patient relationship. Moreover, this line of questioning was not relevant and Jackson made no proffer of what he expected to reveal by pursuing it. Thus, while the circuit court made the right decision for the wrong reason, there was no error in sustaining the State's objection to the line of questioning.

¶66. Jackson further argues that during the sentencing phase of the trial, the circuit court improperly limited Dr. Summers' testimony regarding the sources of his diagnosis that Jackson suffered from intermittent explosive episodes, a complex partial seizure disorder and possibly, a brain disfunction associated with multiple episodes of brain trauma. To establish Jackson's history of head trauma, Dr. Summers testified that he had examined Jackson's medical records and sought to interview coaches, supervisors and family members who had been present when these injuries occurred. As he began to recount what he had been told by Jackson's high school football coach, the State objected on grounds of hearsay and later on grounds that the testimony was repetitious. Although various family members already had testified about the injuries Jackson had suffered over the years, the circuit court overruled the objection and allowed Dr. Summers to continue.

¶67. From the context of Dr. Summer's testimony, it appears that he was restricted only from recounting his conversation with Jackson's football coach. Dr. Summers discussed at length the various sources of his evaluation: statements made by friends and family members, interviews with Jackson, psychiatric and psychological evaluations, medical and prison records. Any further recitation would have been cumulative under Miss. R. Evid. 403.

> XX. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE DISTRICT ATTORNEY TO CROSS-EXAMINE A WITNESS OUTSIDE THE SCOPE OF

PERMISSIBLE SENTENCING PHASE TESTIMONY

¶68. On cross-examination, the prosecution briefly examined Jackson's mother, Martha Jackson, regarding the amount and ownership of the money in the safe. Despite the defense's vigorous objections, Mrs. Jackson reluctantly stated that Curtis had borrowed $300.00 from her but had not paid it back, that she knew that her son, Eddie Self, had been convicted for selling cocaine and that she had put the $16,000.00 certificate of deposit in the safe. Jackson contends that in so questioning his mother, the prosecutor, by alleging "that the money in the family safe was obtained through the sale of illegal drugs," went beyond the scope of proper questioning and attacked the credibility of family members who testified on Jackson's behalf.

¶69. During the sentencing phase of a death penalty case, "the state is limited to offering evidence that is relevant to one of the aggravating circumstances included in § 99-19-101." *Stringer v. State*, 500 So. 2d 928, 941 (Miss. 1986); *Coleman v. State*, 378 So. 2d 640, 648 (Miss. 1979). The aggravating circumstances are limited to those enumerated in Miss. Code Ann. § 91-19-101 (rev. 1994). *Balfour v. State*, 598 So. 2d 731, 748 (Miss. 1992). One of the aggravating circumstances put forward by the State was that the capital offense was committed for pecuniary gain pursuant to Miss. Code Ann. § 99-19-101(5)(f). During the guilt phase of the trial, the jury had been made aware of Eddie Self's conviction for cocaine and its connection with the money in the safe. The prosecution's line of questioning during the sentencing phase was not relevant to development of the enumerated aggravated circumstances. However, since the origins of the safe contents were brought out during the guilt phase, any error in admitting Mrs. Jackson's testimony was, at best, harmless.

XXI. WHETHER THE TRIAL COURT ERRED BY PROHIBITING DEFENSE COUNSEL FROM TELLING JURORS THAT "LIFE" MEANS "LIFE"

XXII. WHETHER THE TRIAL COURT FAILED TO PROPERLY INSTRUCT JURORS ON THE PROPER PRESUMPTIONS TO GUIDE SENTENCING DELIBERATIONS

¶70. Jackson next contends that the circuit court erred in preventing him from adequately informing the jury regarding the option of life imprisonment. The circuit court granted the State's Motion in Limine to Prohibit Discussion of Meaning of Life Sentence, prohibiting counsel for Jackson or the State from mentioning to the jury that imposition of a life sentence would mean either that the defendant would be imprisoned for the rest of his life or that he could be eligible for parole, because of the prejudice that could result from either statement. Jackson now contends that granting the order prevented him from making a proper argument to the jury regarding the nature of the available sentencing options. He further asserts that the circuit court erred in refusing to grant his requested instruction, D-S-5, which would have instructed the jury on the presumption of life imprisonment.

¶71. There is no merit to Jackson's arguments. Eligibility for parole, actions of the parole commission and the judge's determination of the configuring of sentences are not the proper subject either of closing arguments or jury instructions. *Williams v. State*, 544 So. 2d 782, 798 (Miss. 1987)(Jessie Derrell Williams); *Williams v. State*, 445 So. 2d 798 (Miss. 1984)(Walter Williams, Jr.). *See also, Griffin v. State,* 557 So. 2d 542, 553 (Miss. 1990)(prosecutor's mention of possibility of parole during closing arguments contributed to cumulative errors warranting reversal of case). In so far as the jury instruction is concerned, in *Chase v. State*, 645 So. 2d 829 (Miss. 1994), where it was asserted that an instruction allowed by the trial court improperly shifted to the defense the burden of

proving that mitigating circumstances outweighed aggravating circumstances, we flatly rejected the appellant's argument that "a defendant should go into the sentencing phase with a presumption that life is the appropriate punishment." *Chase*, 645 So. 2d at 860. *See also*, *Leatherwood v. State*, 435 So. 2d 645, 650 (Miss. 1983)(if defendant "had not been convicted of a capital offense, there would be no need for the sentencing hearing and he would simply be sentenced to serve a life term. This does not mean though that the procedure is unfair or faulty.") Accordingly, we find no merit in either argument.

### XXIII. WHETHER THE CIRCUIT COURT ERRED IN PROHIBITING DEFENSE COUNSEL FROM PRESENTING ARGUMENTS ON THE INFLUENCE OF RACE UPON THE DEATH PENALTY

¶72. Before closing arguments were made in the sentencing phase of the trial, the circuit court granted the State's an *ore tenus* motion in limine to prohibit the defense from making racial arguments against the death penalty. Jackson raised no objections. He now contends that the court's ruling inhibited his ability to exercise the "wide latitude" afforded to attorneys in making closing arguments and created a risk that the trial could be tainted by racial prejudice.

¶73. Jackson's claim is procedurally barred by his failure to make a timely objection at trial. *Russell v. State*, 607 So.2d 1107, 1117 (Miss. 1992); *Fleming v. State*, 604 So.2d 280-292 (Miss. 1992). Even looking at the merits of his argument, Jackson's reliance on *McCleskey v. Kemp,* 481 U.S. 279, 107 S. Ct. 1756, 95 L.Ed.2d (1987) is misplaced. While *McCleskey* may, as Jackson suggests, stand for the proposition that racial arguments may be appropriate in some situations, it certainly does not hold that such arguments are necessarily proper for presentation to the jury. Moreover, as distinguished from *McCleskey,* Jackson makes no claim of racial bias, presents no proof of racial bias and was not faced with any potential bias on the basis of the race of his victims. Accordingly, there is no merit to his argument.

### XXIV. WHETHER THE SENTENCING VERDICT FORM WAS DESIGNED TO ENCOURAGE JURORS TO NEGLECT ADEQUATE CONSIDERATION OF SENTENCING OPTIONS OTHER THAN DEATH

¶74. Jackson next contends that the form of the sentencing verdict was such that jurors were led to overlook sentencing options other than death. Jackson raised no objection to the instruction at trial and thus has waived his right to challenge it on appeal. *Conner v. State*, 632 So. 2d 1239, 1273) (Miss. 1993)(failure to object at trial to form of verdict waived right to complain on appeal). However, we note that for each count of capital murder, space for the foreman's signature was provided only for the first sentencing option, the death penalty, and not for the second option, life imprisonment. In a similarly-structured instruction in *Jenkins v. State*, 607 So. 2d 1171, 1180 (Miss. 1992), however, we found fault with the instruction, stating:

> We are concerned that the instruction as written and printed could cause the jury to neglect Options Two and Three. Upon retrial, we suggest that the trial court revise this instruction to more clearly instruct the jury.

*Id.* Although Jackson's claim is procedurally barred, we again urge the trial courts to exercise more caution in the issuance of such instructions.

XXV. WHETHER THE TRIAL COURT ERRED IN GRANTING THE AGGRAVATING CIRCUMSTANCE THAT THE DEFENDANT CREATED A GREAT RISK OF DEATH TO MANY PERSONS

¶75. Jackson next objects to the inclusion in Instruction S-1 of the statutory aggravating circumstance that the "defendant knowingly created a great risk of death to many persons." Miss. Code Ann. § 99-19-101(5)(c). At trial, he asserted that the language was vague and allowed the jury to speculate. He now contends that "[t]he aggravating circumstance is directed toward punishing someone who acts in such a way as that persons *other* than the intended victim or victims is killed" and that the question "is not how many were killed, but whether the method of killing was such that persons not intended to be victims were in danger of harm, e.g., methods such as arson, bombing, or shooting wildly into a crowd."

¶76. We have addressed this issue only tangentially, noting in **Wheeler v. State**, 536 So. 2d 1341 (Miss. 1988), where a conviction was affirmed as to the lesser-included offense of simple murder, that the defendant's action of seizing a police officer's gun and firing it at random had allowed the jury to find that he "'knowingly created a great risk of death to many persons.'" ***Id***. at 1344. Other jurisdictions, in determining the applicability of this particular aggravator, have reached results as various as the circumstances of the individual case, colored by statutory language, the nature of the weapon used and the number and location of the victims. Thomas J. Fleming, Annotation, *Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance That In Committing Murder, Defendant Created Risk of Death or Injury to More than One Person, to Many Persons, and the Like -- Post-**Gregg** Cases*, 64 ALR 4th 837 (1988 and Supp. 1994).

¶77. We reject Jackson's argument and adopt instead the position taken by our sister jurisdiction in ***Ex parte Giles***, 632 So. 2d 577 (Ala. 1993), where the defendant, like Jackson, asserted that the aggravator applied only to those instances where there was a great risk to those other than the **intended** victims. The Alabama court held that "[i]t would be anomalous to hold that § 13-11-6(3) allows sentence enhancement where the defendant **unintentionally** endangers persons other than the homicide victims, but disallows enhancement where the defendant **intentionally** threatens the lives of others." ***Id***. at 584 (emphasis added). It further has found that the aggravating circumstance is applicable where there are multiple victims. ***Giles v. State,*** 632 So. 2d 568, 573 (Ala. 1992)(evidence showed that defendant killed husband and wife, shot their daughter in the eye and one son in the chest and stabbed another); ***Wesley v. State***, 575 So. 2d 108 (Ala. Cr. App. 1989), rev'd on other grounds, 575 So. 2d 127 (Ala. 1990)(defendant killed two people, wounded three and attempted to murder a policeman).

¶78. In cases where, as in the case *sub judice*, multiple victims have been stabbed in the same or a nearby room, courts in other jurisdictions generally have found that there was sufficient evidence to warrant the "great risk to many persons" aggravating circumstance. ***Nguyen v. State***, 769 P.2d 167 (Okla. 1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989)(three victims all knew defendant and resided in same house where murdered); ***State v. Monroe***, 397 So.2d 1258 (La. 1981), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1141 (198 3)(defendant stabbed victim's daughter who tried to intervene before fatally stabbing victim during a struggle); ***State v. Ortiz,*** 131 Ariz. 195, 639 P.2d 1020 (1981), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d

863 (1982) (overruled in part on other grounds by *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983) and *State v. Richmond,* 136 Ariz. 312, 666 P.2d 57 (1983) (defendant fatally stabbed victim, stabbed two of her three children, set house on fire and told children not to leave until fire department arrived).

¶79. Considering the circumstances of this case, where four children were stabbed to death and one adult and two other children received life-threatening stab wounds, we find that use of the "great risk to many persons" aggravating circumstance certainly is warranted. To restrict its use to those crimes where very large numbers of individuals were at risk or those where the safety of others than an intended few was jeopardized would limit the statute beyond its intended scope. Thus, the jury was properly instructed.

### XXVI. WHETHER THE CIRCUIT COURT ERRED IN INSTRUCTING THE JURY TO CONSIDER THE UNDERLYING FELONY AS AN AGGRAVATING CIRCUMSTANCE

¶80. Jackson next asserts that the inclusion of the aggravating circumstance that he was engaged in commission of the crime of felonious abuse and/or battery of a child at the time of the murders in Counts 1 through 4 of Sentencing Instruction S-1 duplicates an element of the offense for which he was charged, thus violating the eighth amendment because of its failure to narrow the class of defendants eligible for the death penalty. Jackson made no contemporaneous objection to the instruction on this ground. Notwithstanding Jackson's failure properly to preserve the issue for appellate review, *Russell v. State*, 607 So. 2d 1107, 1117 (Miss. 1992), there is no merit to his argument. The United States Supreme Court has held that as long as the class of defendants eligible for the death penalty is narrowed during the guilt or sentencing phase of the trial, "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." *Lowenfield v. Phelps,* 484 U.S. 231, 246, 108 S.Ct. 546, 555, 98 L.Ed.2d 568 (1988). In *Ladner v. State*, 584 So. 2d 743 (Miss. 1991), this Court, again rejecting the contention that aggravating factors could not be "stacked," reiterated *Lowenfield,* stating:

> The United States Supreme Court held that when constitutionally required narrowing of the class of persons eligible for the death penalty is accomplished by the legislative definition of capital offenses in the guilt phase (as is done in Louisiana and Mississippi), the jury's further narrowing of the sentencing phase is not constitutionally required. [*Lowenfield*, 484 U.S.] at 241-46, 108 S.Ct. at 552-55, 98 L.Ed. 2d at 579-83.

Accordingly, there was no error in allowing the jury to consider the underlying felony as an aggravating factor.

### XXVII. WHETHER THE CIRCUIT COURT ERRED IN GRANTING THE AGGRAVATING CIRCUMSTANCE THAT JACKSON COMMITTED A PREVIOUS VIOLENT FELONY

¶81. Jackson next asserts that the State failed to meet its burden in proving the aggravating circumstance that he had committed a prior "felony involving the use or threat of violence to the person" within the meaning of Miss. Code Ann. § 99-19-101(5)(b) in a lovers' triangle incident because the gun he had used was inoperable and separate kidnaping charges against him were dropped.

¶82. As evidence of Jackson's prior felony, the State submitted a certified copy of the indictment and judgment as well as testimony by police officers present at the incident. A certified copy of the judgement alone has been found by this Court to be sufficient evidence of a prior crime. **Berry v. State**, 575 So. 2d 1, 14 (Miss. 1990); **Minnick v. State**, 551 So. 2d 77, 96 (Miss. 1990), *rev'd on other grounds sub nom. **Minnick v. Mississippi,*** 498 U.S. 805, 111 S.Ct. 35, 112 L.Ed.2d 489 (1990). There is no merit, therefore, to Jackson's specific claims that there was insufficient evidence to support a finding that the felony "involved a threat of violence against the person" because the gun he used could not fire and the kidnapping charges were dropped. In **Berry**, where the appellant asserted that his prior conviction was invalid as an aggravating factor because he had obtained a civil judgment against the police officer who shot him during the incident, this Court found that "[d]espite these disturbing facts, the trial court cannot retry all prior convictions; thus, we have held the trial judge is not required to look beyond the prior conviction, valid on its face." **Id.** at 14; **Nixon v. State**, 533 So. 2d 1087, 1099 (Miss. 1987). Thus, there was no basis for the circuit court to make extensive inquiry into the facts behind Jackson's prior conviction.

## XXVIII. WHETHER SENTENCING INSTRUCTION S-3 IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD

¶83. Sentencing Instruction S-3 provides as follows:

> The Court instructs the Jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders -- the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the Defendant utilized a method of killing which caused serious mutilation, that the Defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that the lingering or tortious death was suffered by the victim then you may find this aggravating circumstance.

Jackson contends that this instruction is overbroad and unconstitutionally vague, setting up a "multiple choice" questionnaire for jurors to contend with. A brief analysis of the instruction, however, shows that both this Court and the United States Supreme Court have found this language sufficient to limit the jury's consideration of the "heinous, atrocious or cruel" aggravating circumstance.

¶84. In **Shell v. Mississippi**, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), the United States Supreme Court found that used alone, language identical to that used in the first paragraph of the instruction was not constitutionally sufficient.[6] However, language used in the first sentence of the second paragraph:

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders -- the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

was determined by the United States Supreme Court to be a proper limiting instruction to the *Shell* language in *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 1108 L.Ed.2d 725 (1990). Finally, in *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), we noted that when considering whether a crime could be considered "especially heinous, atrocious or cruel," it had stated in *Pinkney v. State*, 538 So. 2d 329, 357 (Miss. 1988), vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 725 (1990), that:

> barbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or tortuous death was suffered by the victim.

*Hansen*, 592 So. 2d at 152. Although this aspect of *Pinkney* was not addressed in the United States Supreme Court's review of the case, similar limiting language, also like that employed in the last sentence of Instruction S-3, was approved in *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 3096, 111 L.Ed.2d 606, 615-16 (1990) and *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 3053, 111 L.Ed.2d 511, 523-24 (1990). Accordingly, we find no merit to this assignment of error.

### XXIX. WHETHER THE CIRCUIT COURT REFUSED TO PROPERLY INSTRUCT JURORS ON THE EXISTENCE OF MITIGATING CIRCUMSTANCES TO CONSIDER IN SENTENCING DELIBERATIONS

¶85. Jackson asserts that the circuit court erred in refusing to grant his requested Instruction D-S-6, asserting that with mitigating factors, "that 'credible evidence' is presumed to be true, and that, unless the State rebuts the evidence beyond a reasonable doubt, it may be considered by jurors when weighing mitigating against aggravating circumstances."

¶86. Almost anything for which there is an evidentiary basis may be considered by the jury as mitigating circumstances. *Chase v. State,* 645 So. 2d 829, 856 (Miss. 1994). In *West v. State,* 519 So. 2d 418 (Miss. 1988), this Court explained:

> The law is now well established that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character, record, or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Jordan v. State,* 518 So. 2d 1186 (Miss. 1987).

519 So. 2d at 426. However, there is no basis for the refused instruction's directive regarding the State's burden to rebut any mitigating evidence. It is, to the contrary, an incorrect statement of the law and was properly refused by the circuit court. *Willie v. State,* 585 So.2d 660, 673 (Miss. 1991).

### XXX. WHETHER THE CIRCUIT COURT ERRED IN REFUSING TO PROVIDE JURORS RELEVANT AND IMPORTANT MITIGATION EVIDENCE

### XXXI. WHETHER THE CIRCUIT COURT ERRED BY FAILING TO INFORM THE JURY

OF SENTENCES JACKSON WOULD BE REQUIRED TO SERVE ON HIS CONVICTIONS FOR ARMED ROBBERY AND TWO COUNTS OF AGGRAVATED ASSAULT BEFORE THE JURY DELIBERATED ON HIS DEATH SENTENCE

¶87. Jackson further contends that the circuit court's failure to inform the jury of the sentences he would be required to serve for the other charges against him deprived him of the opportunity to convey important mitigating evidence to the jury. He first asserts that the circuit court's refusal to grant Jury Instruction D-S-13 denied him the opportunity to instruct the jury that if sentenced to four consecutive life sentences on Counts 1 through 4, he would not be eligible for parole for forty years.

¶88. We have found that evidence of other sentences might be used as a mitigating factor to show that the defendant would be subject to serious punishment even if the death penalty were not imposed. *Davis v. State*, 512 So. 2d 1291, 1293 (Miss. 1987). However, matters such as eligibility for parole or lack thereof and the judges determination of sentence configuration are not a proper subject of jury instructions. *Williams v. State,* 544 So. 2d 782, 798 He further argues, that this Court has allowed "evidence of mitigating circumstances of an unlimited nature." *Davis,* 512 So. 2d at 1293, quoting *Leatherwood v. State,* 435 So. 2d 645, 650 (Miss. 1983). See also *Chase v. State,* 645 So. 2d 829, 856 (Miss. 1994)(restriction only that evidence is relevant). While the *Davis* Court noted that "it is highly unusual for a defense counsel to cite the existence of another prison sentence as a mitigating factor (indeed, we have never heard of it being done before)," it suggested that the evidence might be used to show that the defendant was subject to severe punishment even if the death penalty were not imposed. *Davis*, 512 So. 2d at 1293. As distinguished from *Davis*, however, where the judge refused the defendant's request to admit his sentencing order as evidence, the record does not indicate that Jackson attempted to introduce the other sentences as mitigating evidence or that the circuit court refused to admit the sentencing order. Since he neither attempted to introduce evidence of the other sentences nor requested an appropriate jury instruction, the assignment of error is procedurally barred. *Williams v. State*, 445 So. 2d 798 (Miss. 1984). Accordingly, there is no merit to this assignment of error.

## XXXII. WHETHER THE CIRCUIT COURT ERRED IN FAILING TO INSTRUCT THE JURY ON NON-STATUTORY MITIGATING CIRCUMSTANCES

¶89. Jackson asserts that he should have been allowed a separate mitigating instruction that he had demonstrated extreme remorse for the crimes committed. Instruction S-1, a "catch all" instruction was given. This Court long has accepted the use of a "catch-all" to encompass any mitigating circumstances not specifically enumerated under Miss. Code Ann. § 99-19-101(6). *Gray v. State*, 375 So. 2d 994, 1003-1004 (Miss. 1979). In *Neal v. State*, 451 So. 2d 743, 761 n. 11 (Miss. 1984), *cert. denied*, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984)(approving the "catch-all" language used in *Gray*). Accordingly, Jackson cannot complain that he was not afforded the opportunity to instruct the jury to consider remorse as a mitigating factor.

## XXXIII. WHETHER THE CIRCUIT COURT ERRED IN REFUSING TO INFORM JURORS ON THE STATUTORILY MANDATED MANNER OF JACKSON'S EXECUTION

¶90. Jackson next asserts that the circuit court, in refusing jury instruction D-S-2, denied him the opportunity to inform the jury that if sentenced to death, he would be executed by lethal injection. He

mistakenly relies on *Caldwell v. State*, 443 So. 2d 806, 814 (Miss. 1983), where we stated merely that there was no error where, during the sentencing phase of the trial, the prosecutor and the judge "truthfully and accurately stated that the sentence of death would be automatically reviewed by a higher court." *Caldwell,* 443 So. 2d at 814. Nothing in the language of *Caldwell* suggests that the jury **must** be informed of each and every "automatic component" of a capital murder case through jury instructions or any other means. To the contrary, the method of execution is of no concern to the jury. In *Williams v. State,* 445 So. 2d 798 (Miss. 1984), where the Court found that references to the possibility that the defendant not be sentenced to death are "wholly out of place" in the sentencing phase of a capital murder case, it was stated, "[i]t is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder." *Id.* at 813. Accordingly, we find no merit to this assignment of error.

> XXXIV. WHETHER THE CIRCUIT COURT FAILED TO PROPERLY INSTRUCT JURORS ON A STATUTORILY REQUIRED ASPECT OF SENTENCING DELIBERATION

> XXXV. WHETHER THE TRIAL JUDGE FAILED TO CORRECTLY INFORM JURORS ON WEIGHING AGGRAVATING AND MITIGATING CIRCUMSTANCES

> XXXVI. WHETHER THE CIRCUIT COURT FAILED TO ADEQUATELY INSTRUCT JURORS ON "AUTOMATIC" REQUIREMENTS TO IMPOSE A DEATH PENALTY

¶91. Jackson next argues that the circuit court erred in refusing to grant a variety of instructions which we characterize as "mercy instructions." He first argues that the circuit court misconstrued the requirements of Miss. Code Ann. § 99-19-101(2) and kept the jurors from being fully informed of their responsibilities in imposing a proper sentence by refusing to grant Instruction D-S-4, which reads simply:

> If any juror has any doubt as to the appropriate punishment then you shall not sentence Henry Curtis Jackson, Jr. to death.

He further asserts that the circuit court erred in denying jury instructions D-S-7, D-S-9, D-S-10, D-S-11 and D-S-12A. With the exception of Instruction D-S-7, these instructions all expressly employ the term "mercy" or its synonyms, "pity" or "sympathy." As to Instruction D-S-7, he contends that the jury was not properly instructed that it was **not required** to sentence him to death.

¶92. We have held that mercy instructions are not required and further, that their issuance is within the discretion of the circuit court. *Foster v. State,* 639 So. 2d 1263, 1301 (Miss. 1994); *Jenkins v. State,* 607 So. 2d 1171, 1181 (Miss. 1992); *Hansen v. State,* 592 So. 2d 114, 150 (Miss. 1991). In *Jenkins,* where no reversible error was found in the lower court's refusal to grant a mercy instruction, it was explained that:

> The recent decisions of this Court and of the United States Supreme Court enumerate that a mercy instruction is not required at trial. In *Ladner* [*v. State*, 584 So. 2d 743, 761 (Miss. 1991) ], we held that a defendant "has no right to a mercy instruction." *Ladner*, 584 So. 2d at 761. In *Saffle v. Parks*, 494 U.S. 484, 492-93, 110 S.Ct. 1257, 1262-63, 108 L.Ed.2d 415, 427-28

(1990), the U.S. Supreme Court stated that the giving of a mercy instruction results in a decision based upon whim and caprice. Thus, the lower court was within its discretion when it denied the mercy instruction below.

*Jenkins*, 607 So. 2d at 1181. See *Foster*, 639 So. 2d at 1299-1300 (instruction directing jury that it need not find any mitigating circumstances to return a life sentence found to be a mercy instruction). We therefore find no merit to these assignments of error.

> XXXVII. WHETHER ERRORS IN JURY INSTRUCTIONS AT THE SENTENCING PHASE COMBINED TO REQUIRE MR. JACKSON'S SENTENCES TO BE VACATED

> XXXVIII. WHETHER THE AGGREGATE EFFECT OF THE ERRORS IN THIS CASE REQUIRES REVERSAL OF MR. JACKSON'S CONVICTIONS AND VACATION OF HIS SENTENCES

¶93. Jackson contends that the combination of errors in jury instructions at the sentencing phase as well as the aggregate effect of the errors in both phases of the trial warrant the reversal of his case. See *Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991), cert. denied, 504 U.S. 921, 112 S. Ct. 1970, 118 L.Ed.2d 570 (1992). However, many of Jackson's assignments of error are procedurally barred and those remaining are without merit. Therefore, we find no merit in these assignments of error.

## CONCLUSION

¶94. Pursuant to Miss. Code Ann. § 99-19-105(3)(Supp. 1985), in addition to reviewing the merits of those issues raised by the defendant, we are required to determine:

> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

> (b) Whether the evidence supports the jury's or judge's findings of a statutory aggravating circumstances as enumerated in Section 99-19-101; and

> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

¶95. Since our decision in *Jackson v. State*, 337 So. 2d 1242 (Miss. 1976), we have upheld the imposition of the death penalty in the cases listed in the appendix. We have carefully reviewed those cases and compared them with the case and sentence *sub judice*. Having done so, we find that the sentence of death in this case was not influenced by passion, prejudice, or any other arbitrary factor and that the evidence supports the jury's findings of statutory aggravating circumstances as listed in Miss. Code Ann. § 99-19-105(5)(Supp. 1983). Considering the appellant and the facts of the crime committed, we find that the sentence of death in this case is neither excessive nor disproportionate to those cases in which such sentence has been imposed and upheld.

¶96. Having reviewed the record as submitted from the Circuit Courts of Leflore and Copiah Counties, we find no errors warranting reversal. Accordingly, we affirm the conviction of capital murder and sentence of death.

**¶97. CONVICTION OF CAPITAL MURDER (FOUR COUNTS) AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(1972) AND M.R.A.P. 41(a).**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., ROBERTS, SMITH AND MILLS, JJ., CONCUR. BANKS, J., CONCURS IN RESULT ONLY. PITTMAN, J., NOT PARTICIPATING.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Russell v. State,* No. 93-DP-00418-SCT (Miss. Dec. 7, 1995).

*Walker v. State,* No. 92-DP-00568-SCT (Miss. Oct. 12, 1995).

*Ballenger v. State,* No. 93-DP-00081-SCT (Miss. Sept. 21, 1995).

*Lockett v. State,* 656 So. 2d 76 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Simon v. State*, No. 91-DP-00343-SCT (Miss. Feb. 9, 1995).

*Chase v. State,* 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

* *Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) *reversing, in part, and remanding,* *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) *remanding for new sentencing hearing*.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989), *Minnick v. Mississippi*, 498 U.S. 146 (1990), *vacating and remanding,* *Minnick v. State*, 573 So.2d 792 (1991) *remanding for new trial.*

* *Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) *vacating and remanding,* *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) *remanding for new sentencing hearing*.

* *Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) *vacating and remanding,* *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) *remanding for new*

*sentencing hearing.*

**Woodward v. State**, 533 So. 2d 418 (Miss. 1988), **Woodward v. State**, 635 So.2d 805 (1993) *sentence vacated and remanded for new sentencing hearing.*

**Nixon v. State**, 533 So. 2d 1078 (Miss. 1987).

**Cole v. State**, 525 So. 2d 365 (Miss. 1987), **Cole v. State,** No. 94-DP-00217-SCT (Miss. Nov. 30, 1995) *sentence vacated and remanded for new sentencing hearing.*

**Lockett v. State**, 517 So. 2d 1346 (Miss. 1987).

**Lockett v. State**, 517 So. 2d 1317 (Miss. 1987).

**Faraga v. State**, 514 So. 2d 295 (Miss. 1987).

* **Jones v. State**, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi**, 487 U.S. 1230 (1988) *vacating and remanding,* **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) *remanding for new sentencing hearing.*

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986), **Wiley v. State**, 635 So.2d 802 (1993) *remanding for new sentencing hearing.*

* **Johnson v. State**, 477 So. 2d 196 (Miss. 1985), **Johnson v. Mississippi**, 486 U.S. 578 *vacating and remanding* (1988), **Johnson v. State**, 547 So.2d 59 (1989) *remanding for new sentencing hearing.*

**Gray v. State**, 472 So. 2d 409 (Miss. 1985).

**Cabello v. State**, 471 So. 2d 332 (Miss. 1985).

**Jordan v. State**, 464 So. 2d 475 (Miss. 1985).

**Wilcher v. State**, 455 So. 2d 727 (Miss. 1984).

**Billiot v. State**, 454 So. 2d 445 (Miss. 1984).

**Stringer v. State**, 454 So. 2d 468 (Miss. 1984).

**Dufour v. State**, 453 So. 2d 337 (Miss. 1984).

**Neal v. State**, 451 So. 2d 743 (Miss. 1984).

**Booker v. State**, 449 So. 2d 209 (Miss. 1984).

**Wilcher v. State**, 448 So. 2d 927 (Miss. 1984).

**Caldwell v. State**, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).


*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 61 (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

1. For reasons not enumerated in the record, Jackson was not charged with the stabbing of one-year old Andrea Jackson, who sustained a paralyzing stab wound to her spinal cord during the melee.

2. Although Jackson did not file any post-trial motions, Miss. Code Ann. § 99-19-105(1)(1994) provides that "[w]henever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Mississippi Supreme Court."

3. The prosecution struck three white jurors as well. All twelve of the defense's peremptory strikes were against white venire members.

4. The circuit court clarified that Dr. Whelan was not employed by the Department of Corrections.

5. Dr. Summers, Jackson's psychiatrist of choice, also testified that Jackson was sometimes less than honest with him.

6. That portion of the instruction is taken from the Fifth Circuit's decision in *Spinkellink v. Wainwright*, 578 F.2d 582, 611 (5th Cir. 1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 11 (1990). See also, *Jenkins v. State*, 607 So. 2d 1171, 1181 (Miss. 1992).